460 F.2d 391
 Geraldine L. LIGHTENBURGER et al., Appellees,
v.
UNITED STATES of America, Appellant.
Ivory COMBS and North American Aviation, Inc., Appellees,
v.
UNITED STATES of America, Appellant.
Joan GORDON et al., and Edith Carrington, Appellees,
v.
UNITED STATES of America, Appellant.
EAGLE STAR INSURANCE CO., Appellee,
v.
UNITED STATES of America, Appellant.
 Nos. 24854-24857.
 United States Court of Appeals,
Ninth Circuit.
 April 27, 1972.
As Amended on Denial of Rehearing
May 26, 1972.
 
 1
 Donald A. Fareed, Asst. U. S. Atty. (argued), Frederick M. Brosio, Jr., Asst. U. S. Atty., William Matthew Byrne, Jr., Robert L. Meyer, U. S. Attys., Los Angeles, Cal., for appellant.
 
 
 2
 Morton Galane (argued), Las Vegas, Nev., Oliver, Good & Sloan, Los Angeles, Cal., Hilbrecht & Jones, Rex Jemison, of Singleton, DeLanoy, Jemison & Reid, Las Vegas, Nev., Oliver, Sloan, Vargas, Shaffer & Lindvig, Irving Green, and Karl Seuthe, Los Angeles, Cal., for appellees.
 
 
 3
 Before MERRILL and HUFSTEDLER, Circuit Judges, and SOLOMON, District Judge.*
 
 SOLOMON, District Judge:
 
 4
 James Gordon, Bervial Carrington, and Dale Lightenburger were killed when their twin-engine private plane crashed into the North American Aviation facilities at Los Angeles International Airport (L.A. Airport). The crash and fire which followed seriously injured Ivory Combs, a North American ground employee, and heavily damaged the North American facilities.
 
 
 5
 Appellees are Ivory Combs, North American Aviation, Inc., Eagle Star Insurance Co., as subrogee for the destroyed aircraft, and the families of the three fatally injured occupants of the plane. They filed these actions under the Federal Tort Claims Act, Title 28 U.S.C. Sec. 1346(b), to recover for wrongful death, personal injuries and property damage which resulted from the crash.
 
 
 6
 The District Court (Court) consolidated the actions and found in favor of all appellees. Lightenburger v. United States, 298 F.Supp. 813 (C.D.Cal.1969). The United States appealed.
 
 
 7
 Shortly after 2:00 P.M. on December 6, 1962, Gordon and his business associates, Lightenburger and Carrington, left McCarran Field in Las Vegas to attend a business meeting in Los Angeles. With Gordon at the controls of his new Cessna 310G, they flew under an instrument flight plan which gave L.A. Airport as the prime destination and Burbank Airport as an alternate destination.
 
 
 8
 As the plane approached Los Angeles, Gordon requested and received clearance to land at Santa Monica Airport. Gordon flew over Santa Monica, but returned to L.A. Airport when he found Santa Monica closed because of bad weather.
 
 
 9
 At 3:52 P.M., Gordon made contact with the Los Angeles Approach Radar Control (AR-1) and learned that the weather conditions were poor. In spite of repeated reports of deteriorating visibility, Gordon elected to land at the L.A. Airport. At 3:58 P.M., visibility was one-half mile with smog and haze. At 3:59 P.M., AR-1 informed Gordon that the runaway visual range (RVR) was 1200 feet. Gordon replied that he wanted full radar approach, which AR-1 acknowledged. On the same radar frequency as Gordon, AR-1 informed a United Airlines jet that the pilot of an American Airlines Boeing 707 ahead of the United flight had executed a missed approach[1] when he could not see Runway 25 Left (the runway) at minimums.[2] The United pilot elected to wait for better conditions before attempting to land and so informed the tower.
 
 
 10
 At 4:01 P.M., AR-1 told the United flight to climb to 4,000 feet and told Gordon to turn left on his approach. Gordon acknowledged the message. At 4:04, AR-1 placed Gordon under the control of a Precision Radar Approach (PAR)[3] Controller who established contact with Gordon at 4:05. At that time Gordon was seven miles from touchdown.
 
 
 11
 The PAR Controller gave Gordon a heading and an RVR measurement of 1,000 feet. The PAR Controller also informed Gordon that, "this approach will be terminated at the middle marker[4] one-half mile from touchdown."
 
 
 12
 At 4:06 P.M., the PAR Controller informed Gordon that the RVR was less than 1,000 feet and that he was about to intercept the glide path at a point four and three-quarters miles from touchdown. From that point to a point one mile from touchdown, Gordon stayed on or near the glide path.
 
 
 13
 When Gordon was three miles from touchdown, the PAR Controller informed him, "latest weather indefinite ceiling zero sky obscured visibility zero with fog RVR less than 1000 feet." Shortly thereafter, PAR asked, ". . . do you plan (unintelligible) an approach with this weather or do (unintelligible) land with this weather." Gordon responded, "Ah put me right down on the runway."
 
 
 14
 When Gordon was one mile from touchdown, the PAR Controller told him that he was a few feet above the glide path. At 4:10, when the Cessna was one-half mile from touchdown, the PAR Controller stated:
 
 
 15
 "Now oh ah fifteen feet from the glide path still a half mile from touchdown turn right one degree two five zero you're lined up with the left shoulder of the runway you passed the middle marker now coming up over the highway and going twenty five feet below the glide path adjust descent take over and complete your landing visually on runway two five left if you're not ah contact executed a missed approach climb westbound to VFR conditions on top."
 
 
 16
 Air Surface Radar Detection observed the plane flying over the runway for 3,000 feet at an altitude of about 150 feet.[5] At approximately 4:12, the plane made a sudden violent 210 degree turn and crashed downward into a parking lot of North American Aviation facilities.
 
 
 17
 Gordon, Carrington and Lightenburger were killed. The plane crash and resulting fire injured Ivory Combs, who was working near the site of the crash, and it damaged North American Aviation, Inc., property. The Cessna was completely destroyed.
 
 
 18
 At the time of the crash, Burbank Airport was reporting a two-mile visibility, and Long Beach Airport a three-mile visibility. The Cessna still had more than four hours of fuel.
 
 
 19
 The Court found that the accident was caused by violent turbulence over Runway 25 Left, created by a previous missed approach of an American Airlines Boeing 707 over the runway at 4:00 P.M., which was at least 10 minutes before Gordon began his approach and 12 minutes before his plane crashed. This turbulence, called wing tip vortex, was described by the Court:
 
 
 20
 "When a heavy aircraft flying at slow speed accelerates, the passage of the wings through the air causes a roll-up of the air mass at the tip of each wing. The air mass continues to swirl much in the same manner as a tornado, except that its position in the air is horizontal. The force of the resulting tornados is proportional to the weight, wing span and speed of the aircraft. . . . The size, weight and acceleration of a Boeing 707 is such as to create a violent disturbance in the air." Lightenburger v. United States, 298 F.Supp. 813, at 822-823 (1969).
 
 
 21
 The Court also found that Gordon was a qualified pilot with no physical ailments; the Cessna was mechanically sound; the PAR Controller did not warn Gordon of possible turbulence left by the missed approach of the American Airlines Boeing 707; the PAR Controller did not inform Gordon that he was passing the middle marker and continued his advisories even though he had told Gordon that advisories would terminate at the middle marker; the PAR Controller did not use Federal Aviation Agency (FAA) prescribed wording in his last advisory; and the sudden left turn of the Cessna just before the crash was beyond the control capacity of the aircraft.
 
 
 22
 The Court found that Gordon was free from negligence, was entitled to initiate this approach and to continue it to minimums, and that at the time of the crash Gordon was executing a standard missed approach procedure by gaining speed in level flight before climbing away from the airport.
 
 
 23
 The government denied any negligence and contended that the crash was caused either by Gordon's decision to attempt to land under the adverse weather conditions or by his failure to properly execute a missed approach. The government also contends that the wing tip vortices were an unforeseeable and intervening cause of the accident.
 
 
 24
 The Court rejected each contention of the government and found in favor of the plaintiffs on each of their four theories of liability.
 
 
 25
 (1) "The PAR Controller Was Negligent In That He Knew, Or Should Have Known, That A Hazard Existed In The Form Of Wing Tip Vortices From The Prior Missed Approach Of The Boeing 707, And Breached His Duty To Warn The Pilot Of This Hazard."
 
 
 26
 (2) "The PAR Controller Was Negligent In Failing To Give The Warning Required By the Air Traffic Control Procedures Manual, Sec. 411.7."
 
 
 27
 These two grounds for recovery, one based on ordinary negligence and the other on a violation of a safety regulation, rest upon the Court's finding that the wing tip vortices were foreseeable.
 
 
 28
 Air Traffic Control Procedures Manual (ATCPM), Sec. 411.7 reads:
 
 
 29
 "When controllers foresee the possibility that departing or arriving aircraft might encounter rotorcraft downwash, thrust stream turbulence or wing tip vortices from preceding aircraft, cautionary information to this effect should be issued to pilots concerned.
 
 
 30
 "Note.-Since the existence and effect of turbulence is unpredictable, the provision of the above information does not constitute the placing of responsibility on controllers to anticipate in all cases the need for such information."
 
 
 31
 The Federal Aviation Agency (FAA) and the PAR Controllers working with the FAA have a duty to warn a pilot when it appears to them that the pilot may encounter a wing tip vortex. United States v. Furumizo, 245 F.Supp. 981 (D.Hawaii), aff'd, 381 F.2d 965 (9th Cir. 1967).
 
 
 32
 The Court found that the wing tip vortices created twelve minutes earlier by a Boeing 707 missed approach caused the crash. We accept this finding.
 
 
 33
 The Court also found that the PAR Controller should have foreseen the danger of the wing tip vortex persistence and the PAR Controller violated his duty by failing to warn Gordon of this danger.
 
 
 34
 We reject this finding as clearly erroneous. All of the credible evidence shows that a 12-minute persistence of hazardous turbulence from a wing tip vortex was both improbable and unforeseeable.
 
 
 35
 The Boeing and the Cessna were separated by twelve minutes. No witness testified that the PAR Controller should have foreseen the turbulence or should have given the 411.7 warnings. Edmund Burke, an FAA specialist in accident analysis, testified that of the hundreds of thousands of take-offs and landings each year, no wing tip vortex problem was experienced when aircraft were maintained at Instrument Flight Rule (IFR) minimum separations of three miles. This would be about one and one-half minutes.
 
 
 36
 Plaintiff's own expert, Vance Breese, testified that he had never heard of a vortex persistence of more than six and one-half minutes. He described the circumstances which caused this crash as, "a situation that doesn't happen once in a million landings."
 
 
 37
 The Court viewed an FAA instructional film, titled, "Wake Turbulence." The film warned that "wake turbulence may remain severe in excess of five minutes." James Nimmo, a pilot and technical advisor for the film, testified that this time span was the most conservative estimate possible, made to give warning to the most inexperienced pilot under the worst possible wake turbulence conditions.[6]
 
 
 38
 The Court apparently reached its finding that hazardous vortices could persist for twelve and one-half minutes by extending the conclusions in the Bleviss Report based upon the relative sizes of DC6B's and Boeing 707's. The Bleviss Report was prepared for Douglas Aircraft Company in 1954. It is a theoretical analysis of wing tip vortices, based not upon experiments, but upon mathematical and engineering approximations of vortex activity behind a DC6B.
 
 
 39
 On vortex persistence time, the Bleviss Report attempts to define rules of thumb which would allow for safe operation of small aircraft. It concluded that a safe take off and landing separation would be less than two and one-half minutes except when there was a crosswind component of between two and one-half and seven miles per hour.[7] In that event, the report recommends a separation of greater than five minutes but less than ten minutes. However, the report admits that no calculations were made for more than five minutes.
 
 
 40
 The intensity of a vortex increases with the weight of the aircraft. A Boeing 707 weighs 100,000 pounds more than a DC6B; government witness Zalovcik estimated that a 707 would generate a vortex about 25 per cent more intense than would a DC6B. The Court assumed that a vortex from a 707, being 25 per cent more intense than one from a DC6B, would also take 25 per cent more time to decay to a non-hazardous level. The Court therefore reasoned that the Bleviss rule of thumb for vortex persistence behind a DC6B, which the Court assumed was 10 minutes, increased 25 per cent to twelve and one-half minutes for a Boeing 707.
 
 
 41
 The Court sought support for its conclusions and asked Zalovcik to assume the validity of a 10-minute rule of thumb and a 25 per cent increase in vortex persistence for a Boeing 707. On these assumptions, Zalovcik admitted the correctness of the twelve and one-half minute calculation, but he denied the validity of the assumptions, the simplistic method of arriving at this figure, and the possibility of any hazardous vortex persisting for twelve and one-half minutes no matter how generated.
 
 
 42
 Zalovcik also testified that the Bleviss Report was made without experiments and that the conclusions were based on theoretical computations which did not consider "ground effect"-a critical factor in vortex persistence. In addition, the Bleviss Report was internally inconsistent. The report stated that, after five minutes, decay increased the core radius less than one foot, but Figure 12, attached to the report, showed an increase in core radius from seven to fifty feet within five minutes. Zalovcik also testified that after seven minutes, the turbulence rate, even on a mathematical basis, was so low that it did not create a hazard, could not be distinguished from a mere gust of wind, "and would have an imperceptible effect on the Cessna."
 
 
 43
 His conclusion was supported by other scientific evidence and expert testimony.
 
 
 44
 The Kraft Report, published in 1955 by the National Advisory Committee for Aeronautics, was an experimental analysis of wing tip vortices. The author measured persistence for only 60 seconds and concluded that vortices do not appreciably lose strength for 35 seconds, after which they begin to deteriorate.
 
 
 45
 The Air Traffic Service Bulletin on wing tip vortices, published for Air Traffic Controllers by the FAA, three weeks before the crash warned that "[m]uch remains to be learned about the characteristics and behavior of vortices"; they can "last for several minutes in calm air"; and the "path of turbulence behind a heavy aircraft can extend for a distance of three to seven miles." At take off and landing speeds, this would be about one and one-half to three minutes.
 
 
 46
 The longest actual vortex measurements were made in England, and they showed no significant vortex persistence after four minutes.
 
 
 47
 The overwhelming weight of scientific reports and the testimony show that no credible data existed to enable either the PAR Controller or the FAA to predict that wing tip vortices might persist for as long as six minutes. Even if the Court chose to rely on the unsubstantiated reports of several pilots who claim to have experienced dangerous turbulence during flight, none of them reported wing tip turbulence had persisted for more than seven and one-half minutes.
 
 
 48
 In our view, it was clearly erroneous to find that the PAR Controller was negligent when he failed to warn Gordon of the hazards of wing tip vortices from a missed approach of a Boeing 707 which occurred more than ten minutes before Gordon commenced his approach and more than twelve minutes before the crash.
 
 
 49
 The Court found liability on two other theories:
 
 
 50
 (3) "The PAR Controller Was Negligent In That He Gave A Series of Misleading, Confusing, Improper And Unduly Deferred Advisories To The Pilot."
 
 
 51
 (4) "The PAR Controller Was Negligent In Failing To Give The Instruction Required By The Air Traffic Control Procedures Manual, Secs. 344.9 and 394.7."
 
 
 52
 During the approach, the PAR Controller advised Gordon that the radar approach would be terminated at the Middle Marker, which was one-half mile from touchdown, at an altitude of 210 feet. Instead, the PAR Controller waited for 35 to 45 seconds to inform Gordon that he had passed the Middle Marker. At that time Gordon was 25 feet below the preselected minimum safety altitude.
 
 
 53
 Section 344.9 of the Air Traffic Control Procedures Manual states:
 
 
 54
 "344.9 If an aircraft exceeds the lower and/or lateral limits of the prescribed safety zone to a point where, in the judgment of the controller, safety of flight is likely to be affected, the pilot shall be instructed to climb to a specified altitude and fly a specific course, as appropriate."
 
 
 55
 The purpose of this directive is to prevent low-flying planes from colliding with buildings or other fixed objects on the ground.
 
 
 56
 The prescribed instruction for such low-flying aircraft is set forth in Section 394.7 of the Manual:
 
 
 57
 "394.7 To instruct a pilot to discontinue approach when the aircraft exceeds safety limits: IF RUNWAY NOT IN SIGHT, CLIMB IMMEDIATELY TO (altitude), TURN LEFT/RIGHT, HEADING (degrees), (reason and further clearance, if appropriate), ACKNOWLEDGE."
 
 
 58
 There are two proper ways to execute a missed approach. One is by an immediate climb, and the other is by making a more gradual ascent by gaining speed prior to climbing. Absent an emergency, either one is acceptable, but in an emergency the safer method is to climb immediately. Instead of using the language of the manual, the PAR Controller said:
 
 
 59
 "Going twenty five feet below the glide path adjust descent take over and complete your landing visually on runway two five left if you're not ah contact execute a missed approach climb westbound to VFR conditions on top."
 
 
 60
 The Court held that the PAR Controller was required to use the uniform terminology in Section 394.7 and his failure under the circumstances to use this terminology not only violated the provisions of the regulation, but was also negligence.
 
 
 61
 "The phraseology selected by the PAR Controller may well have induced confusion and disorientation in the pilot, exposing him . . . to all reasonably foreseeable hazards, including the disorientation of the pilot and other forces such as the effects of wing tip vortices." Lightenburger v. United States, supra, 298 at 835.
 
 
 62
 Even if we assume that it was negligence not to have issued the warning with the precise terminology of the regulation, there was no causal connection between such negligence and the crash.
 
 
 63
 The Court found that the crash was the result of severe turbulence caused by the wing tip vortices of the Boeing 707. We have already held that this danger was not reasonably foreseeable.
 
 
 64
 Although the Court speculated that the failure to use the uniform phraseology "might induce confusion and disorientation" (P. 835), or "possibly . . disorientation" (P. 839), there was no finding that Gordon became disoriented, and such a finding would have been inconsistent with the Court's other finding:
 
 
 65
 "The evidence excludes any failure on the part of the pilot or the aircraft. The final violent maneuver was beyond the controlled capacity of the aircraft. The Court necessarily finds that it occurred as the result of turbulence from wing tip vortices, the only outside force acting upon the aircraft." Lightenberger v. United States, supra, at 839.
 
 
 66
 The finding that the United States was liable on either of these two theories was clearly erroneous.
 
 
 67
 We need not consider the validity of appellant's other contentions.
 
 
 68
 These cases are reversed and remanded to the District Court with instructions to enter judgments in favor of the United States.
 
 
 
 *
 Honorable Gus J. Solomon, United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The procedure by which a pilot accelerates his airplane to climb away from an attempted landing, when he decides that the landing is unsafe or impossible
 
 
 [2]
 The point on the landing approach path at which a pilot decides to land visually or to execute a missed approach. Minimums on Gordon's approach was at an altitude of 200 feet
 
 
 [3]
 A procedure by which a controller with the aid of radar informs approaching pilots of their position in relation to an established landing glide path so that the pilot may be guided to minimums and visual contact with the runway
 
 
 [4]
 A point one-half mile from touchdown on the glide path of the PAR approach to Runway 25 Left at Los Angeles International Airport
 
 
 [5]
 This was approximately 1500 feet beyond touchdown
 
 
 [6]
 "I did base this [five minutes] on . . . the most absolute ideal conditions that could possibly exist. The heaviest of the heavy aircraft that we have with a pilot of the least flying experience and meteorological conditions that were most conducive to such a thing, which generally we speak of as an absolute dead calm wind
 "When I say in excess of five minutes, I mean just barely in excess of five minutes.
 "Q. But you mean less than six minutes?
 "A. Oh yes . . . ."
 
 
 [7]
 It is not clear whether there was such a cross wind at the time of the crash