Charlotte Joan YATES et al.,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

EAGLE STAR INSURANCE CO., LTD.,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 73-1656.

United States Court of Appeals,
Tenth Circuit.

April 29, 1974.

James J. McCarthy of Magana & Cathcart, Los Angeles, Cal. (Avelino V. Gutierrez and Dennis M. McCary of Keleher & McLeod, Albuquerque, N. M., on the brief), for appellee.

Jean A. Staudt, Atty., Dept. of Justice, Washington, D. C. (Irving Jaffe, Acting Asst. Atty. Gen., Victor R. Ortega, U. S. Atty., and Robert Kopp, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Russell Moore, Albuquerque, N. M., for plaintiff-appellee Eagle Star Ins. Co., Ltd.

Before BREITENSTEIN, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Presented on appeal is an airplane casualty case, an action against the United States brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Following a trial to the court, judgment was entered in favor of the plaintiff, the widow of the pilot who died in the crash, in the total amount of $375,540, the same being loss of earnings and loss of services. Judgment in the amount of $8,500 was also entered for plaintiff Eagle Star Insurance Company, the insurance carrier on the airplane.

The crash of the airplane produced the death which occurred on August 3, 1969, at which time the pilot, Thomas A. Yates, was seeking to land a Cessna 172H at the Albuquerque, New Mexico airport. He had flown from Grants, New Mexico.

The evidence showed that although Yates was a fully licensed private pilot, he had logged only 100 hours of flight time and had executed some 150 landings and takeoffs. Yates was at the time of the crash involved in study looking to becoming a licensed commercial pilot. He had flown to Albuquerque

from Grants, New Mexico for the purpose of meeting an employee of his instructor, Mr. Humphries. The Cessna 172H had been borrowed by Yates from Humphries.

On the night in question visibility was clear and extended for approximately 60 miles. Visual flight rules were in effect and air traffic at Albuquerque was said to be moderate. All aircraft was using a north-south runway, No. 17, due to the fact that the east-west runway was closed. Landings were being carried out from north to south on Runway 17 which is about 9,000 feet long. Yates had previously landed in Albuquerque on at least six occasions.

There existed an airport traffic control tower operated by the United States at the Albuquerque airport. It was manned by Federal Aviation Administration personnel. The approach control position in the radar room was handled by Donald J. Sanger and supervised by R. Nattress. The local air tower control position was manned by William H. Haines and the CAB coordinator's position was manned by William E. Moore.

Yates arrived in the Albuquerque area on August 3, 1969, at approximately 7:46 p. m. He contacted Albuquerque approach control and requested landing instructions. At that time he informed the radar controller that he was ten miles west of the Albuquerque Vortac station, the navigational aid located near the airport. The controller responded and directed the pilot to fly a right traffic pattern into the airport and land on Runway 17. Thereafter, at 7:53 p. m., the radar controller advised Yates to follow a TWA 707 aircraft which was then eight miles west of the airport and coming in for a landing. Yates was then given the location of the 707 and told to report when he saw it. Yates acknowledged this instruction and reported sighting it. Following this instruction,

the Cessna was turned over to local approach control at the airport. The local controller can visually observe aircraft approaching the field with the exception of a blind zone in the tower which obscures the approach of Runway 17 for the first 1500 to 2000 feet. The controller told Yates to continue his approach and to follow the TWA 707 on the two mile final approach.[1] The speed of the 707 was 140 knots and that of the Cessna was 80 knots.

Next, the local controller, from a view of the flight pattern of the Cessna, noted that it was veering in a northern direction away from the runway and so he advised Yates to keep in close behind the TWA jet. The controller was aware also that there were other planes in the area and he advised the pilot "Cessna six two fox keep your traffic close behind the TWA jet, there are others behind you." In response to this Yates corrected his flight pattern turning east and slightly south so as to follow behind the 707. As the Cessna approached the runway, the local controller lost visual contact with it as a result of the blind zone in the tower. Prior thereto the Cessna had maintained an altitude above that of the TWA 707, but even though the controller had the Cessna monitored through a radar scope, he was incapable of determining the plane's altitude. The TWA 707 landed slightly long on the runway, touching down at approximately 4500 feet from the beginning of the runway. It taxied to the end of the runway and turned off toward the terminal. Simultaneously with the TWA landing, the Cessna was on a final approach to Runway 17, but had dropped its altitude to approximately 200–300 feet above the ground. At approximately 300 feet from the commencement of the runway, the Cessna encountered wake turbulence from the 707. As a result of this, the pilot lost control of the airplane and it crashed, killing him and destroying the plane.

1. "Cessna six two foxtrot continue approach. Cessna six two foxtrot follow TWA jet two mile final."

The FAA inquiry concluded that the crash "was caused by a loss of control in flight due to an encounter with wake turbulence and insufficient altitude to recover before striking the ground."

In ruling for the plaintiff the trial court held that the United States is liable for the negligence of its airport control personnel. In particular, the court found that the negligence of the FAA controllers consisted of 1) failing to provide adequate separation between the decedent's aircraft and the preceding TWA 707 transport aircraft; 2) advising decedent to keep his aircraft in close behind the preceding 707 jet aircraft and telling him at the same time that there were other planes behind him; and 3) failing to advise decedent of the presence of the hazard of wake turbulence caused by the 707 jet transport.

Evidence at the trial, according to the court, showed that wake turbulence is generated behind and below heavier aircraft. This turbulence is invisible and moves in a circular fashion from a vortex. It is capable of remaining for periods ranging from 10 to 12 minutes. The paths from these vortices remain until they strike the ground and are disintegrated. A small aircraft flying at low altitudes encountering wake turbulence is in a very dangerous situation.

Although the government sought to establish that the Cessna crashed as a result of stalling, the overwhelming weight of the evidence disproved this. The evidence also showed that Mr. Humphries, the instructor, had talked to Yates on the subject of wake turbulence. Humphries said that Yates had more knowledge on the subject than most pilots. At the trial he amended this to more knowledge than most pilots of his (Yates') experience.

A trans-Texas Convair 530 Turboprop aircraft was following the Cessna in a landing pattern very closely behind the Cessna. The evidence also showed that the Cessna, after receiving the instruction to get in behind the 707, altered its flight pattern so as to come in close behind the 707.

In seeking a reversal the government, first, maintains that the trial court's finding and conclusion that the FAA controllers were negligent was clearly erroneous. They rely on the fact that the regulations establish that each pilot is in command of and responsible for his own aircraft and has the final authority with respect to its operation, and that it is up to the pilot to exercise his own judgment as to existence of hazard and to refuse to accept instructions which he considers increase his peril. The government says that Yates was guilty of either sole or contributory negligence in flying into the wake turbulence area regardless of whether the government instructed him to follow the TWA 707 and that the local controllers were not guilty of negligence in failing to maintain proper separation between the 707 and the Cessna.

Second, the government contends that the pilot was contributorily negligent. He was flying under visual flight rule conditions and there was flight visibility for a distance of at least three miles so that he could observe all other aircraft in the area. Under these conditions, according to the government, he is required to maintain his own distances in accordance with the rules governing all aircraft. They argue that even if the government may have been negligent, it is clear that the pilot was guilty of contributory negligence and is therefore barred from a recovery. It was the obligation, so the government argues, of Yates to maintain a landing pattern slightly above that of the preceding plane and to touch down on the runway at a point beyond the touch down point of the preceding plane. This, so it is argued, Yates did not do. The government cites and relies on Sanbutch Properties v. United States, 343 F.Supp. 611 (N.D.Cal.1972); Thingulstad v. United States, 343 F.Supp. 551 (S.D.Ohio 1972); Wasilko v. United States, 300

F.Supp. 573, (N.D.Ohio 1967) aff'd, 412 F.2d 859 (6th Cir. 1969).

Third, it was not negligence on the part of the controllers to fail to warn of the existence of wake turbulence.

The trial court has made extensive findings of fact and conclusions of law on the points which are advanced. To succeed, the government must, of course, demonstrate plain error.

## I.

The tower is a circular glass-enclosed room allowing observation in all directions, and it is located at the top of the air control tower and is known as the tower cab. Its lower portion has the radar room and does not permit observation.

Mr. Sanger, who operated the approach control position in the radar room, was a trainee and was supervised by a Mr. Nattress, who had no active participation in the proceedings leading up to the crash in question. In addition to the men mentioned, one William E. Moore was in the tower cab acting as liaison between the approach controller and the local controller. His function was to assist both. He passed on information from the approach controller to the local controller by telephone.

The court found that the facts which we have recited correctly described the occurrences immediately preceding the approach of the Cessna and its crash. Thus, no serious dispute exists as to the cause of the crash and as to the happenings leading to it. It is not disputed that Sanger did not give the decedent a cautionary warning regarding the existence of wake turbulence and that Mr. Haines, the local controller, did order decedent to follow the TWA 707 more closely. The judge found that the approach controller was required to consider the relative speeds of the aircraft, and that after reaching a certain point Yates became subject to the local controller, who told him to continue the same approach sequence he had been placed in. It was Mr. Haines who told the decedent to keep in close behind the TWA jet "there are others behind you." The court found that Haines was apparently under the mistaken belief that it was necessary to get the Cessna plane to the ground so as to avoid the oncoming Trans-Texas Convair which was behind him.

The court found that the TWA touched down on Runway 17 beyond the intersection with the east-west taxiway and so had to go to the end of the runway in order to turn off. This factor, the judge found, precluded the possibility of an emergency landing by decedent's plane at a point beyond the touch down of TWA 707. The court went on to find that the expert testimony on behalf of the government as to the feasibility of the Cessna effecting a landing beyond the TWA was rejected as "unpersuasive."

The judge further found that the instructions from Mr. Haines in the tower deprived the decedent of any choice. The judge reasoned that after all, the controller had a better view and more complete knowledge of the air traffic pattern, whereby the decedent had a right to rely on this instruction. The decedent did not have a view of the surrounding circumstances which would permit him to reject the decision of the controller in favor of a decision of his own. At the time of the crash the court found that Yates could do nothing to prevent it since he no longer had control of his aircraft.

## II.

We conclude that the trial court's findings and conclusions that the controllers were negligent which was the proximate cause of the collision and of Yates' death are supported by the record.[1]

■■ The relationship between the air controller and the pilot of a plane

1. A brief summary of the supporting testimony of the judge's findings is appended to this opinion.

which is landing or taking off creates a duty of care on the part of the controller. The government argues that plaintiff had no right to rely on instructions which the air controller gave him, and it was up to him to form his own judgment. We fail to see the controller's directions and warnings as being merely advisory. It is true that the regulations state that a pilot is directly responsible for and is the final authority as to the operation of the aircraft, and they also say that in an emergency the pilot may deviate from the regulations to the extent required to meet the emergency. He must, however, when he has deviated, send a written report of the deviation to the administrator upon request. What appears to be a conflict can be reconciled. A pilot has a choice before he commits himself to a landing, but after the commitment he is not free to change his course and thereafter he is controlled by the controller. Along this same line we note that 49 U.S.C. § 1430(a)(5) declares that it is unlawful for any person to operate aircraft in air commerce in violation of any other rule, regulation, or certificate of the Administrator. This supports our view that what appears to be a conflict between the regulation declaring that the pilot is in command of the aircraft and the regulations giving traffic control authority to the government controllers are consistent after all. This becomes clear in light of considering that if the pilot could depart from the control of the tower at any time in his discretion, the airfield traffic would soon become a shambles. We cannot, therefore, accept the view that the controllers with the complex equipment which they employ are there merely to give advice. The recognition of these functions as legal obligations gives rise to an attendant duty to perform these functions with reasonable care.

At bar the pilot Yates was peculiarly susceptible to the control of the controllers since he was piloting a light plane in between heavy jets. Once he received and followed the controller's instructions with respect to landing he was not free to disregard the directions given and exercise independent initiative. For all practical purposes, he was in complete control of the tower. The hazardous traffic pattern, the direction which enhanced the danger and the failure to direct as to turbulence all contributed to the tragic result.

As to the failure to warn of the wake turbulence: Once Yates was caught in the traffic sequence which produced his death it is questionable whether any warning as to wake turbulence would have helped, but prior thereto such a warning could have been very significant. Surely the controllers were obligated not only by the Manual to give such a warning, but also the traffic condition was fraught with hazard. In relationship to the extent of the hazard the warning would have called for very little effort, and so based on this analysis the trial court was correct in holding that it was negligent to fail to warn.[2]

It is familiar law that one in the care and custody of another where the circumstances deprive the person of an ordinary opportunity to protect himself has a right to expect that the person exercising the custody shall use reasonable care and caution for his protection. *See* Restatement of the Law of Torts Second §§ 314 and 320.

The cases cited and relied on by the government are factually distinguishable. We have examined Sanbutch Properties v. United States, *supra*, Lightenburger v. United States, 460 F.2d 391, 9th Cir. 1972, cert. den. 409 U.S. 983, 93 S.Ct. 323, 34 L.Ed.2d 248, and Thingulstad v. United States, *supra*. In

2. One of the experts for plaintiff said that the approach controller and the local controller were both required to warn of turbulence and could have avoided the accident had they done so. The other expert said that the local controller should have warned of wake turbulence just prior to the time that he ordered Yates to get behind the 707 and in between that plane and the Convair Turbo-prop from Texas.

884

*Lightenburger* the wing tip vortices or turbulence had been created some 12 minutes before. Although the district court found that this caused the crash the court of appeals reversed. It rejected the contention that the controllers could be held responsible for a condition allegedly created at such a remote time. The court held that the evidence was insufficient to establish that this was the cause and also held that there was no duty to warn as to wing tip vortices in view of the time lapse.

In *Sanbutch* the trial court held that the proximate cause of the crash was the negligence of the pilot who, it was held, ignored the presence of the turbulence. It is true that the judge in *Sanbutch* took a very narrow view of the duty of the controllers, but this was not the factor which produced the result. *Thingulstad* is also distinguished on its facts because there it was decided that the heart attack of the pilot was the cause of the crash.

■ It has long been recognized, however, that negligent discharge of responsibilities in situations like the present one can result in federal government liability under the Federal Tort Claims Act. *See* Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In this case there was a negligent failure to tend a lighthouse, whereby it was held that where the government undertakes to warn of danger and thereby induces reliance, it is subject to liability for failure to discharge its duty. Similarly, the decision to operate air control towers and maintain air traffic separation is a legislative one and negligent operation of the facilities subjects the United States to liability. United States (Eastern Air Lines) v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62 (1955), affirmed, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799; Air Transport Associates v. United States, 221 F.2d 467 (9th Cir. 1955); Ingham v. Eastern Air Lines, 373 F.2d 227 (2d Cir. 1967), cert. denied, United States v. Ingham, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292.

We have found no cases that are comparable to the present one in which the controllers directed the pilot to fly close to the much heavier plane which when landing was almost certain to cause wake turbulence. As we view it, this is the factual point of differentiation which deserves attention and emphasis. It is not correct to say that regardless of facts there can never be a recovery by plaintiffs who stand in the shoes, so to speak, of a pilot who has been the victim of wake turbulence. *See, for example,* Wasilko v. United States, 300 F.Supp. 573, aff'd, 412 F.2d 859 (5th Cir. 1969), and *cf.* United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967).

### III.

■ We agree also with the trial court's determination that the suit is not barred by contributory fault on the part of decedent. The government's contention that Yates was guilty of contributory negligence is based wholly on the fact that he failed to avoid the crash and thus was unable to cope with the wake turbulence. They stress the fact that he was fully aware of its existence and of methods for avoiding it. It is said that he could have done so if he had maintained a landing pattern slightly above that of the preceding plane and had touched down on the runway at any point beyond the touchdown point of the preceding plane, but there is no showing that he failed to observe these procedures. The loss of control occurred after the 707 had touched down and while the Cessna had altitude of 200–300 feet. There is reason to believe, therefore, that the pilot would have touched down beyond the point where the TWA 707 landed had the failure not occurred before. Therefore, we are of the opinion that the trial court's conclusion that the standard landing procedure could not be followed in this instance is fully supported by the evidence. It seems clear to us as it did to the trial court that the closeness of the sequence was the critical factor and this was brought about by the controller. It does not answer any

of this to say, as the government does, that the pilot flew into the wake turbulence. Accordingly, then, there is no basis for holding that the trial court committed plain error in its refusal to find and conclude that Yates was guilty of contributory negligence.

The judgment of the district court is affirmed.

## APPENDIX

### HIGHLIGHTS OF THE TESTIMONY
*Witness Donald J. Sanger*

The controllers, Mr. Sanger, who was in the approach position at the time of the crash, and Mr. Haines, who was the local controller, were called by the plaintiff as adverse witnesses. Sanger was shown to have been a trainee. At the time he was receiving on the job training. The approach controller operates from radar. Sanger, according to his testimony, had not prior to the instant crash known that wake turbulence was capable of turning an airplane over. He recognized the need for a local controller to give a caution but did not recognize a similar need on the part of an approach controller. The local controller, at least according to Sanger, had to exercise a judgment. As a trainee, Sanger was not allowed to work as a controller unsupervised and a Mr. Nattress was aiding him on the instant occasion. It was his obligation to put the aircraft in an approach sequence, whereas the local controller can change this sequence for the purpose of landing. It was also his duty to see that two airplanes did not run over each other in approaching the airfield. Speed as well as direction and altitude are factors which determine their sequence. He acknowledged that the Cessna which crashed was sequenced behind the TWA 707. He did not consider the effect of wake turbulence, maintaining that it was not his responsibility to do so; that the extent of his obligation was to put them in sequence and then turn them over to local control.

He described the communications which he had with Yates from his first contact some ten miles west of the airport until he turned him over to the local control for landing.

Sanger had five airplanes that he was talking to in addition to the Cessna N–1662F and he was responsible for getting these aircraft into proper approach sequence. There was some confusion as to the approach sequence growing out of the fact that another Cessna was permitted to precede the TWA 707 in landing. This airplane had approached the field and contacted the tower from a short distance out, but Sanger mistakenly believed that the Cessna which crashed had been placed there and advised the Texas International plane that he was to follow the TWA instead of the six two fox trot. There is reason to infer that this resulted in the shortening of the distances of the approaching planes.

*Witness William A. Haines*

The witness Haines, who was the local controller on the occasion in question, testified describing the tower in relation to the field and the control zone of five miles which is the area in which the local controller operates. He said that his sole source of information concerning the phenomenon of wake turbulence was the Airman's Information Manual. He realized that wake turbulence could cause a pilot to lose complete control of his aircraft and that it could result in a crash at a low altitude. He was also aware that he was required by the Manual to give an advisory warning if he felt that wake turbulence was a hazard. At the time of his incident the factors that he would have considered were whether the following aircraft would go below the flight pattern of the aircraft in front, but since this incident he acquired further information having seen a film on the subject of wake turbulence.

NOTE: From reading the testimony of these two controllers, one infers a reluctance on their part to take initiative. Their view appears to be that each pilot is on his own.

*Witness Vance Breese*

Witness Breese testified as an expert on behalf of the plaintiff. He was a pioneer flyer with a wide variety of experience. On the question of wake turbulence warning, Breese said that a wake turbulence caution should have been given at the time that the local controller ordered Yates to follow the 707 closely. At this time it would have allowed Yates to have taken corrective measures. [1]

Breese also testified that there was no harm or burden in giving a wake turbulence warning. From a study of all the facts, Breese stated that there existed a reasonable likelihood that the accident could have been avoided had the pilot been given a wake turbulence warning. He also testified that there should be at least five miles of space behind a landing jet.

He further said that the long landing of the 707 made it impossible for Yates' Cessna to land; that the 707 closed the entire runway to him. An additional statement of the witness Breese was: "I was appalled to learn that these controllers had very little knowledge of wake turbulence."

*Witness Francis M. Mc Dermott*

Witness Mc Dermott also testified as an expert witness. He stated that in his opinion the Manual contemplates that the controllers actually are to control traffic and are to have responsibility for life and property and are not mere advisors. Mc Dermott concluded as to violations of duties by the controllers as follows:

Principally, the violation which runs throughout the sequence of the handling of the aircraft, was the failure to provide the warning of wake turbulence coupled with the failure to provide adequate separation as required by the manual. And in developing this I used the transcripts that I had made, both of the approach control and the local control, and established points, specific points, at which these violations occurred at repeated intervals.

He then went on to call specific attention to the Terminal Air Traffic Control Manual provisions which point out that the Manual requires that adequate spacing be maintained and that the sequence of arriving airplanes be established and that cautionary instructions as to wake turbulence be given. Mc Dermott also said that even during the approach phase of the landing there should have been a wake turbulence caution given. He also said that even in the approach to the airport, it should have been plain to that controller that the Cessna and the 707 were too close regardless of whether the Cessna landed first or the TWA 707 landed first.

[1]. The specific testimony is as follows:

THE WITNESS: No. he had the opportunity when the instruction was issued to come in close, follow the 707 closely, at that time he could have altered his course and avoided the wake turbulence.

THE COURT: If at the very time the unfortunate instruction was given, a wake turbulence caution had been added—

THE WITNESS: Yes, sir.

THE COURT:—then at that point the pilot might have been able to avail himself of some corrective measure?

THE WITNESS: That is correct. His corrective action, if I may add this, Your Honor, would have been, of course, to make a missed approach, to go on out and re-enter the traffic pattern.

THE COURT: Why did the pilot need the control tower to add the caution? Would it not have been reasonable to expect that a pilot committed to such an unfortunate course would have himself asked for additional information, or have declined the instruction?

THE WITNESS: No, sir, the student pilot would not. Under those circumstances, as I have said before, he is so intent upon landing and obeying correctly the instructions of the controller, that he doesn't worry about anything else.

THE COURT: He is committing his safety and the safety of his airplane to the control tower?

THE WITNESS: That is correct.

On the question whether the approach controller should give a wake turbulence warning, Mc Dermott said:

A. I read that testimony in his deposition and I do not agree with it under these circumstances, as radar was being used in Albuquerque at this time. He perhaps was confusing the service that he was rendering to 62 Fox, to a standard use between instrument flights under instrument flight rules and instrument flight separation, which is measured in terms of a thousand feet of vertical separation and certain number of miles of lateral separation.

His use of the radar, however, as had been adopted by the F.A.A. employed in Albuquerque was merely an extension of the duties and functions of the local controller. He was providing V.F.R. advisory service through the use of his radar, and as such he was simply extending the capability of the local controller and had the requirement to issue the same advisory to any aircraft utilizing this service that would be given by the local controller if he was seeing this aircraft with his eyes.

Defense Witnesses (expert)

*Witness William John Harris*

Harris testified as an expert witness for the defense. He did not personally observe the crash. He had extensive flight experience, including 5,300 hours flying time. He was a chief pilot and flight instructor for an aircraft company located at the Albuquerque airport.

Harris expressed several hypothetical opinions based on the factual circumstances of the crash of Yates' plane. He said that 250–300 feet would not be a safe altitude for a Cessna to be flying, based on the estimations of where defendant's eye witnesses first spotted the Cessna. With respect to the Albuquerque airport, he stated that it was not the usual practice to have small planes landing directly behind large planes, but that given the fact that one of the runways was closed on the day of the crash this type of sequencing would not be unusual. Harris also expressed the opinion that, based on the estimations of where the 707 touched down on Runway 17, there would be enough usable runway left for the Cessna to touch down beyond it and land properly. Harris testified generally about his practices in instructing his students that they are the final authorities on operation of their aircraft, that instructions of controllers under visual conditions are advisory only and that the pilot has the final responsibility as to whether he will take or not take advisory instructions. Harris expressed his opinion that for safe operation a pilot of a small craft should operate above the flight pattern of a preceding large craft and touch down beyond the touch down point of the larger craft. He also stated that even if a controller hadn't given a wake turbulence warning, he would still be aware of the danger of turbulence if he were following a large plane and would govern his actions accordingly.

Harris acknowledged on cross that a wake turbulence warning would be a useful piece of information from the controllers to a pilot, but asserted that he or his students wouldn't need one. He also acknowledged that the information that there was traffic behind a pilot would put pressure on him as far as making a decision whether to pull out of sequence, but stated that the pilot still would have the freedom to make the final decision as to whether to attempt to land or to execute a turn around.

*Witness William Edwin Moore*

Moore was the cab coordinator at the Albuquerque airport tower at the time of the crash. His memory of the incident was almost nil, and could not be refreshed by looking at his statement. Counsel went over his statement with him, which indicated that the 707 had landed long and missed its initial depar-

ture gate from the runway. It continued taxiing down the runway, and Moore was still watching it as he received a call that the Cessna had flipped over and he saw a cloud of dust in that vicinity.

There was some testimony about the partially unrecorded conversation with the approach controller regarding the confusion about changing the sequence of the plane that was originally put behind the Cessna.

*Witness Bernard Curtis*

Curtis was an F.A.A. official in the Air Traffic Supervision Section of F.A.A. in Washington, D.C. His formal job title was air traffic control specialist assistant and staff director of air traffic, Washington. His testimony corrected some errors in the transcription of the recorded transmissions of the air controllers on the evening of the crash. He testified generally about the meaning of various F.A.A. regulations and pamphlets. He stated that pilots were responsible for setting up their own separation from planes ahead of them under visual flying conditions. He also stated that arrival radar controllers don't give wake turbulence warnings, that these are given, if at all, by local controllers. He expressed an opinion that the sequencing which took place in this incident was all proper, correct and safe. Curtis asserted that the relationship between pilots and controllers under visual conditions is a cooperative situation, in which the controller assumes that the pilot won't put himself into an awkward or dangerous position.

On cross, he acknowledged that there had been a "misunderstanding" between the approach controller and the local controller about the sequencing of the Cessna and planes ahead of it and behind it.

COMMENT: The expert conclusions were controverted, but the court found the facts, including the expert conclusions, favorably to plaintiff.