20-608-cv
Badilla v. Midwest Air Traffic Control Service

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2020

(Argued: December 1, 2020          Decided: August 9, 2021)

Docket No. 20-608-cv

_____

JESSICA T. BADILLA, CONSORCIA A. CASTILLO, AND ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF BERNARDO G. CASTILLO, DECEASED, JOSEPHINE R. ELBANBUENA, AND ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF WILO M. ELBANBUENA, MICHELLE S. MEDINA, AND ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF NILO T. MEDINA, DECEASED, NELA A. PADURA, AND ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF EDUARDO P. PADURA, DECEASED, INGRID S. BULOS, AND ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF HENRY BELTRAN BULOS, DECEASED, ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF RENE BADILLA, DECEASED,

*Plaintiffs-Appellants*,

v.

MIDWEST AIR TRAFFIC CONTROL SERVICE, INC., A KANSAS CORPORATION,

*Defendant-Appellee.**

_____

* The Clerk of Court is directed to amend the caption as set forth above.

Before:

SACK, CHIN, and LOHIER, *Circuit Judges*.

The estates of crew members and pilots of a civilian flight that crashed into a mountain near Kabul Afghanistan International Airport filed state-law wrongful death claims against the U.S. military contractor providing air traffic control services at the airport, alleging that an air traffic controller's negligent instructions to the pilot caused the fatal crash. Following discovery, the United States District Court for the Western District of New York (Frank P. Geraci, <u>Chief Judge</u>) granted summary judgment to the military contractor, holding that the estates' claims were preempted by the combatant activities exception to the Federal Tort Claims Act and, alternatively, that the contractor neither had a duty to provide "terrain separation" for the flight nor proximately caused the accident. For the following reasons, we **VACATE** the District Court's judgment and **REMAND** for proceedings consistent with this opinion.

THOMAS ROUTH, Nolan Law Group, Chicago, IL (Michael S. McArdle, Nolan Law Group, Chicago, IL, Howard B. Cohen, Gross Shuman Brizdle & Gilfillan, P.C., Buffalo, NY, Kenneth Goldblatt, Goldblatt & Associates, Mohegan Lake, NY, *on the brief*), *for Plaintiffs-Appellants*.

JOHN P. FREEDENBERG, Goldberg Segalla LLP, Buffalo, NY *for Defendant-Appellee* Midwest Air Traffic Control Service, Inc., a Kansas Corporation.

SACK and LOHIER, *Circuit Judges*:

In October 2010, a civilian flight ("Flight 662") crashed into a mountain near Kabul Afghanistan International Airport ("KAIA"), killing all on board. The estates of the crew members and pilots of Flight 662 brought state-law wrongful death claims against Midwest Air Traffic Control Service, Inc.

("Midwest") and others, alleging in relevant part that a Midwest air traffic controller had negligently provided instructions to Flight 662's pilot that put the flight on a collision course with mountainous terrain surrounding KAIA.

Following discovery, the District Court (Frank P. Geraci, <u>Chief Judge</u>) granted Midwest's motion for summary judgment on the grounds that (1) the Plaintiffs-Appellants' claims against Midwest, a military contractor, were preempted by the combatant activities exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 <u>et seq.</u>; and (2) Midwest neither had a duty to provide "terrain separation" for the flight nor proximately caused the accident.  For the reasons set forth below, we **VACATE** the District Court's judgment and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND[1]**

I

In October 2010, Midwest provided air traffic control services at KAIA, which had been designated as a civilian airport.  Both KAIA and its air traffic

---

[1] We have construed the facts in the light most favorable to the Plaintiffs-Appellants and resolved all ambiguities and drawn all reasonable inferences in their favor.  <u>See</u> <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 167 (2d Cir. 2014).

control tower belonged to the Ministry of Transportation and Civil Aviation of the Islamic Republic of Afghanistan.  At the time, the air traffic flying into and out of KAIA consisted of a "mix" of civilian, combat, and combat-support operations.  Insurgents regularly attacked the airport.

Although the airport and control tower belonged to Afghanistan, the North Atlantic Treaty Organization ("NATO") supervised the tower, largely for the purpose of training Afghan civilians as tower controllers.  The Afghan and NATO controllers primarily trained and operated the tower during the day.  Midwest personnel took over the tower's air traffic control operations at night and were not responsible for training the Afghan civilian controllers.

The KAIA air traffic control tower was equipped with a radar presentation that was used as a visual aid for the purpose of sequencing aircraft.  However, the KAIA tower lacked equipment that would alert an air traffic controller to an aircraft's proximity to terrain, such as the mountains that surround the airport.

Midwest operated at KAIA as an approved subcontractor for a prime contract with the U.S. military.  The prime contract obligated Midwest to "provide all personnel, supervision, logistics support, and other items

4

necessary to perform [air traffic control] services as defined in this [statement of work]." App'x 1946. The contract further required that "[a]ll work performed by the Contractor in support of this [statement of work] shall be in accordance with applicable Federal Aviation Administration (FAA) or International Civil Aviation Organization (ICAO) standards and Department of Defense (DoD) regulations as applicable." App'x 1946.[2]

Midwest's tower controllers at KAIA reported to the senior air traffic control officer and his deputy, both of whom were United States Air Force officers. For example, in September 2010, after a Midwest employee raised a staffing issue with his employer rather than with the military officers responsible for the tower's operations, the senior air traffic control officer emailed the chief executive of Midwest stating: "Please advise all [Midwest] tower controllers on the ground here at KAIA that [although] personnel . . .

---

[2] The contract also designated "the services provided by the contractor" as an "essential contract service" and designated "contractor personnel" as "mission essential personnel." App'x 1946. This language requires contractors "to submit [to the Department of Defense] their plans to ensure continuation" of their services in "a broad range of emergencies and crises." Defense Federal Acquisition Regulation Supplement (DFARS); Continuation of Essential Contractor Services (DFARS Case 2009-D017), 75 Fed. Reg. 66,680, 66,681 (Oct. 29, 2010); see 48 C.F.R. §§ 237.7602, 252.237-7023(c).

issues [may be directed to a Midwest manager], ALL operational issues WILL BE DIRECTED to/through myself or [the deputy] first." App'x 268. In response, Midwest's chief executive confirmed that, while Midwest controllers needed to advise their Midwest supervisors about all issues that arose, the controllers had been instructed to direct all operational issues to the senior air traffic control officer and that there was no question that the senior officer was "in charge at the tower." App'x 266.

Midwest personnel directed air traffic around KAIA pursuant to a hierarchy of rules and regulations. Documents or instructions issued by the senior air traffic control officer or his deputy controlled. In the absence of such guidance, the local operating procedures for KAIA applied. If the local operating procedures did not address an issue, then the standard operating procedures for KAIA applied. If the standard operating procedures were silent, then the Afghanistan Aeronautical Information Publication ("AIP") applied. And, finally, if a procedure was not covered by the AIP, then the ICAO standards for air traffic management applied. App'x 999–1000.

The standard operating procedures provided that KAIA air traffic controllers were "responsible for providing safe, orderly and expeditious

6

control to all aircraft operating" in KAIA-controlled airspace. App'x 1364.

The AIP classified the area within 6 nautical miles surrounding KAIA and up to 9,500 feet above sea level as "Class D" airspace for which the KAIA control tower was responsible. The AIP further provided that the "[u]ltimate responsibility for aircraft and terrain avoidance rests with the pilot in command." App'x 1458. The ICAO similarly provided that, for flights conducted in accordance with visual flight rules, "[t]he objectives of the air traffic control service . . . do not include prevention of collision with terrain." App'x 1688.

## II

On October 12, 2010, after sunset at about 14:50 UTC or 7:20 p.m. local Afghanistan time, Transafrik International Flight 662 departed the U.S. Bagram Air Base, some thirty miles north of Kabul, Afghanistan, for KAIA, located just north of Kabul city. The plane was a Lockheed model L-100 cargo aircraft, registered to Transafrik in Uganda and leased to National Air Cargo ("NAC"), an American airline that flies chartered cargo planes. As was typical for Transafrik-NAC cargo flights, there were eight people on board, including the six plaintiffs-decedents: the pilot, Captain Henry Bulos; the co-

7

pilot, former Philippines air force general Rene Badilla; and crew members Bernardo Castillo, Wilo Elbanbuena, Nilo Medina, and Eduardo Padura—all of whom were Transafrik employees and residents of the Philippines.

The crew had already flown on that plane several times that day; the Bagram-to-KAIA flight was the last sortie scheduled for the day, with the crew and plane—likely empty of cargo—returning to their base of operations in Kabul. However, the plane had problems with some of its avionics equipment, according to an email that another Transafrik pilot, Michael Terrell, had sent three days earlier to others at Transafrik, including Captain Bulos. Terrell described the terrain avoidance warning system as inoperable. Normally, the terrain avoidance warning system would display a topographic map and indicate the plane's position relative to the surrounding terrain, with the map showing red when the plane was at a dangerous relative elevation. This plane's terrain avoidance warning system did not present such a display. The plane also lacked or had an inoperable ground proximity warning system, which, when working, sounds an alarm to alert the cockpit that the plane is in dangerous proximity to an obstacle. Terrell's email also reported that the traffic collision avoidance system, designed to help the plane avoid

8

collisions with other aircraft, worked only sporadically. There is no evidence that Transafrik resolved any of these issues in the days following Terrell's email; it appears to have been the airline's practice to keep a plane in operation until new parts could be installed. There is also no evidence that Midwest personnel, including those working in the control tower on the evening in question, were aware of any of these issues with the plane's avionics.

Kabul, KAIA, and the Bagram Air Base are located in a mountainous region in or near the Hindu Kush mountain range. Bagram's elevation is about 4,860 feet above sea level while KAIA, to its south, is some two thousand feet higher. Kabul has been described as lying within the "bowl" of its surrounding mountains. Gregory Scott Adams Dep. at 83, App'x 519.

While the city itself may be well-lit at night, the nearby mountains "are all jet black." Michael Terrell Dep. at 105, App'x 726. As one witness described the terrain:

> Most of the world, there would be lights all over the place, even on mountains generally. Not a lot, but some. The mountains around Kabul had zip, nothing. Any time you're above, maybe a thousand feet above, the valley floor

was pitch black. There were no roads, no cars, no houses, no power lights, no any kind of lights up there.

Id. at 60, App'x 681. Most of this terrain was also outside of the Class D airspace that was within the "control," or responsibility, of the KAIA control tower.

A flight between Bagram and KAIA with an L-100 aircraft ordinarily takes only about 10 minutes if flown according to visual flight rules ("VFR") or 30 minutes under instrument flight rules ("IFR"). When flying under VFR, the pilot is responsible for seeing and avoiding obstacles, such as other aircraft and terrain. The minimum ground visibility for VFR at KAIA was 5,000 meters. The VFR pilot must ensure that he or she can see obstacles outside the plane's windows by, for example, steering clear of clouds. The KAIA standard operating procedures, ICAO standards, and AIP all stated, one way or another, that pilots operating under VFR are responsible for their aircraft's terrain and obstacle avoidance. IFR, by contrast, requires the pilot to rely on air traffic control for obstacle avoidance. As the Kabul tower's deputy senior air traffic control officer explained: "Under IFR . . . an aircraft is obligated to talk to air traffic control. They're obligated to follow our directions unless an emergency situation exists. And air traffic control

provides the separation services for the aircraft. And . . . that [] allows the aircraft to fly through instrument meteorological conditions," such as clouds. Scott Stevenson Dep. at 23, App'x 565. IFR flights into Kabul take longer than VFR flights because the plane must reach an altitude and distance from the airport that allows the plane to show up clearly on radar. As do many airport air traffic controls, KAIA's air traffic control preferred pilots to fly VFR to ease its burden of handling traffic. It was nonetheless the pilot's choice whether to fly VFR or IFR.

Captain Bulos chose to operate Flight 662 according to VFR. Although the flight left Bagram around 7:20 p.m. local time—after sunset—Captain Bulos was permitted to use VFR. Flight 662 had to arrive in Kabul at night because Boeing 747s, which were used to transport Afghans to Saudi Arabia for the Hajj, had been parked on Transafrik's ramp at the airport earlier that evening. A former Transafrik pilot explained that "the airport authority would not let us land until all the Hajj birds were gone and we had space." Michael Terrell Dep. at 58, App'x 679.

The parties agree that KAIA's minimum visibility of 5,000 meters was satisfied that evening, although there was some haze in the area with

temporary visibility of 4,000 meters. The National Transportation Safety Board ("NTSB") indicated that the moon would have provided "limited additional light" and that "[i]t is difficult to determine how much illumination the stars provided due to the haze." National Transportation Safety Board Office of Research and Engineering Aircraft Performance Study (the "NTSB Study"), July 31, 2012, at 12, App'x 1882.

Shortly after takeoff from Bagram Air Base, Flight 662 contacted Bagram Approach Control, which controls traffic departing from and arriving at Bagram. Bagram Approach instructed Flight 662 to maintain VFR and continue on its "own navigation to Kabul." App'x 1917. Bagram Approach then informed Kabul Tower (a separate facility) that Flight 662 was headed to KAIA.

The flight continued to ascend for about five minutes, reaching its maximum altitude of 11,778 feet above mean sea level ("MSL"), which, because of the mountainous surroundings, was about seven thousand feet above ground level. The aircraft remained at this altitude for a few minutes as it flew at a near 180-degree (due south) heading, toward KAIA and Kabul.

About eight minutes into the flight, Flight 662, still flying south, began to descend; it made its first contact with Kabul Tower:[3]

| 7:28:02 P.M. | TKU662 | "Tower.  TKU uh 662" |
| 7:28:05 | Tower | "TKU662" |

NTSB Study at 14-16, Table 1, App'x 1884.  The local controller with whom Flight 662 communicated was one Darrell Smith, a Midwest employee and retired U.S. Air Force master sergeant.  All of the other persons in the tower at that time were also Midwest employees.

Flight 662's Captain Bulos then reported the aircraft's location relative to the airfield traffic pattern and runway, and Smith cleared the flight to land on runway 29, which has a 290-degree compass bearing (i.e., the plane would land to the west-north-west).

| 7:28:08 P.M. | TKU662 | "Roger sir, seven miles to join right downwind for two nine" |
| 7:28:17 | Tower | "TKU662 roger, report a five mile final for two nine please" |

---

[3] The first column of the following verbatim quotations of communications among Flight 662, the KAIA tower, and other aircraft, shows the time; the second column identifies the sender; and the third column contains the contents of the communications.  Quotations are from Table 1 of the NTSB Study at 14–16, App'x 1884–86.

| 7:28:22 | TKU662 | "Five mile final for two nine for TKU662" |
|---|---|---|
| 7:28:50 | Tower | "TKU662 check wheels down, wind zero nine zero at four knots, cleared to land [at] runway two nine" |

NTSB Study at 14, App'x 1884.  At an altitude of about ten thousand feet MSL, Flight 662 turned from its nearly 180-degree bearing to a 140-degree, or south-south-east, direction to take the plane on its "downwind leg" in which it would travel north of the runway but in the opposite direction of its intended landing on the runway, before making, in effect, a U-turn into the final approach.  See NTSB Study at 12, Figure 10, App'x 1882 (reproduced below).

Unbeknownst to Captain Bulos, however, the tower's radar display was not working at the time that Smith cleared Flight 662 to land.  Nor was Smith able to see the plane out of the tower's window.  The radar display, although it turned on moments later, did not, and would not in any event be expected to, show Flight 662's altitude, any minimum safe altitude for the plane, or other indications of the plane's proximity to the terrain.  Smith was also unaware of the specific altitude of the terrain surrounding Kabul.

14

Less than a minute after clearing Flight 662 to land, Smith was contacted by Ariana Afghan Airlines Flight 2748, a civilian IFR flight coming into Kabul from the southeast. Smith told Ariana 2748 that it is "number two to follow" Flight 662 into "runway two niner." NTSB Study at 14, App'x 1884. However, Ariana 2748 responded that it was on a "straight in approach . . . distance [] now one six [sixteen miles] to touchdown." Id.



*NTSB Study at 12, Figure 10, App'x 1882*

Now aware of the relative positions of the planes and concerned that Ariana 2748 might overtake Flight 662 because of the former's straight path to the runway and faster speed, Smith decided to switch the order in which the planes would land. As noted, Flight 662 was headed southeast, toward a point east of the east end of the runway where it would eventually turn almost 180 degrees to land westbound.

15

Just after 7:30 p.m., Smith asked Captain Bulos to extend Flight 662's downwind leg (i.e., continue flying east) and cancelled its landing clearance:

| 7:30:16 P.M. | Tower | "TKU662 can you extend your downwind sir?" |
|---|---|---|
| 7:30:23 | TKU662 | "Uh. copy all extend on downwind TKU662" |
| 7:30:29 | Tower | "Roger. landing clearance cancelled, make a left turn, report established on your downwind. you're number two to follow an Airbus three one zero [Ariana 2748] at about a one zero mile final for two nine" |
| 7:30:38 | TKU662 | "Roger, number two for TKU662" |
| 7:30:39 | Tower | "Thank [y]ou" |

Id. Captain Bulos then turned Flight 662, which had continued to descend to about eight thousand feet MSL, from its 140-degree heading to a 116-degree, or east-south-east, heading. Although Smith had asked Flight 662 to extend its downwind leg, the aircraft was not at that time in the Class D airspace that was the tower's zone of control.

Smith then attended to the departure of another flight, Pamir Airlines Flight 305. After Pamir 305 was cleared for takeoff, Smith cleared Ariana 2748 to land. Smith then spoke to Captain Bulos for the final time:

16

| | | |
|---|---|---|
| 7:31:47 P.M. | Tower | "TKU 662, continue downwind. **I'll call your base**. Traffic you're following [i.e., Ariana 2748] is abeam [you] now [i.e., directly on TKU662's right]" |
| 7:31:53 | TKU662 | "We have it in sight, TKU662 extend the downwind" |

NTSB Study at 15, App'x 1885 (emphasis added). "I'll call your base" meant that Smith would tell Bulos when to turn the aircraft to its "base leg," i.e., the plane would turn right and briefly fly perpendicular to the runway, before turning right again into its final leg for landing.[4]

Air traffic control soon lost contact with Flight 662. Smith then saw a fireball from his position in the tower.

| | | |
|---|---|---|
| 7:32:07 P.M. | Tower | "TKU662 tower, you up?" |
| 7:32:14 | Tower | "TKU662 Tower" |
| . . . | | |
| 7:32:50 | Tower | "And uh Ariana2748 do you see the smoke off to your right sir?" |
| 7:32:58 | Tower | "Ariana2748 tower" |

---

[4] Midwest contends that the statement "I'll call your base" did not mean that Flight 662 could only turn when Smith said so. The meaning of the statement is a factual issue, however, and we therefore accept the Plaintiffs-Appellants' meaning for purposes of reviewing the grant of summary judgment.

17

| 7:33:00 | Ariana2748 | "Tower go ahead" |
|---------|-----------|------------------|
| 7:33:02 | Tower | "Roger, did you copy the smoke off to your right . . . ?" |
| 7:33:05 | Ariana2748 | "Negative" |
| 7:33:23 | Tower | "TKU662 Tower. how do you hear?" |
| 7:33:35 | Tower | "TKU662, ah Kabul tower two on Guard, how do you hear me?" |
| 7:33:46 | Tower | "TKU662, Kabul Approach, how do you hear?" |
| 7:33:52 | Tower | "I mean Kabul Tower, how do you hear?" |
| 7:34:05 | Tower | "TKU662 Kabul Approach how do you hear?" |
| 7:34:52 | Tower | "TKU662 Kabul Approach how do you hear?" |

Id.

Having continued flying at the 116-degree heading it took after Smith asked Bulos to extend its downwind leg, Flight 662 crashed into mountain terrain ten to twelve miles east of the airport and at an altitude of 7,874 feet MSL, killing everyone on board. The cockpit voice recorder and flight data recorder were also destroyed in the crash.

18

III

On October 2, 2012, the Plaintiffs-Appellants, as administrators of the estates of Captain Bulos, co-pilot Badilla, and crew members Castillo, Elbanbuena, Medina, and Padura, filed a complaint in New York Supreme Court, County of Erie, asserting negligence claims against Midwest, NAC, and Transafrik. The Plaintiffs-Appellants claimed that NAC and Transafrik: (1) negligently procured, provided, and dispatched an aircraft "that was not in an airworthy or safe condition" because of issues such as the inoperative terrain avoidance warning system and traffic collision avoidance system; (2) negligently "failed to require and/or provide specific training to the flight crew . . . relative to the operating environment, unsafe conditions, and dangers to be reasonably anticipated during approaches into Kabul"; (3) negligently "failed to require and/or provide proper and adequate navigational aids"; and (4) negligently "failed to ensure proper and safe crew pairing for the intended flight." Compl. at 8–9, App'x 139–40. The Plaintiffs-Appellants claimed that Midwest gave a negligent instruction to Flight 662, negligently failed to provide a minimum safe altitude warning to the flight, negligently "failed to provide necessary instruction to keep a safe and proper

19

separation between . . . Flight 662 and the surrounding terrain," and

"otherwise negligently and carelessly failed to provide proper and safe

instructions, warnings, and/or other air traffic control services to" Flight 662.

Compl. at 11–12, App'x 142–43.

The defendants removed the case to the United States District Court for

the Western District of New York, invoking diversity jurisdiction, federal

enclave jurisdiction, and federal officer jurisdiction.  Notice of Removal,

Badilla v. Nat'l Air Cargo Inc., No. 12-cv-01066-FPG-JJM (W.D.N.Y. Nov. 12,

2012), ECF No. 5.  After the Plaintiffs-Appellants moved to remand the case to

state court, the District Court, upon a report and recommendation from

Magistrate Judge Jeremiah J. McCarthy, determined that while it lacked

diversity or federal enclave jurisdiction, it could exercise federal officer

jurisdiction because Midwest personnel working in the Kabul Tower were

supervised by a federal officer.

The District Court later granted Transafrik's unopposed motion to

dismiss, see Report & Recommendation, id., (W.D.N.Y. July 1, 2015), ECF

No. 92, and dismissed the claims against NAC with prejudice pursuant to a

stipulation of dismissal agreed to by the Plaintiffs-Appellants and NAC, see

20

Text Order, id. (W.D.N.Y. Jan. 12, 2017), ECF No. 154.[5]  With Midwest as the

sole remaining defendant, the case proceeded to discovery on the negligence

claims and Midwest's defense that the claims are preempted under the

government contractor defense, see Boyle v. United Techs. Corp., 487 U.S. 500

(1988), or the FTCA's combatant-activities exception, 28 U.S.C. § 2680(j).

After the close of discovery, Midwest moved for summary judgment on

the grounds that the claims are preempted and, alternatively, that it could not

be held liable for the crash because a pilot flying under VFR is solely

responsible for separating an aircraft from the terrain.  In a Report and

Recommendation issued in April 2017, Magistrate Judge McCarthy

recommended that Midwest's motion be granted, agreeing with the

Defendant-Appellee that the claims are preempted and that Midwest neither

owed a duty of care to Flight 662 nor was a proximate cause of the crash.  In

January 2020, over the Plaintiffs-Appellants' objections, the District Court

adopted Judge McCarthy's recommendation.

This appeal followed.

---

[5] It is not clear from the record whether the dismissal of the claims against NAC was pursuant to a settlement or otherwise.

## DISCUSSION

On appeal, the Plaintiffs-Appellants argue that the District Court lacked jurisdiction over their claims and that it erred in granting Midwest's motion for summary judgment. As we explain below, with respect to the jurisdictional challenge, which we review de novo, see, e.g., Plumbing Indus. Bd., Plumbing Loc. Union No. 1 v. E. W. Howell Co., 126 F.3d 61, 65 (2d Cir. 1997), the District Court correctly determined that this case could be removed to federal court under the federal officer removal statute. However, as to the challenge to the grant of summary judgment to Midwest, also reviewed de novo, construing the evidence in the light most favorable to the Plaintiffs-Appellants and drawing all reasonable inferences in their favor, see, e.g., June v. Town of Westfield, 370 F.3d 255, 257 (2d Cir. 2004), we conclude that the Plaintiffs-Appellants' claims are not preempted and that there remain genuine disputes of material fact regarding the Defendant-Appellee's liability for Flight 662's fatal crash.

I

Although the Plaintiffs-Appellants contest the District Court's exercise of federal officer jurisdiction, we conclude that the District Court properly exercised jurisdiction over the Plaintiffs-Appellants' claims.

The federal officer removal statute, 28 U.S.C. § 1442(a)(1), provides for removal of cases to federal court by a defendant who (1) is a "person" who "act[ed] under [a federal] officer," (2) is being sued for an act taken "under color of [federal] office," and (3) raises "a colorable federal defense." Isaacson v. Dow Chem. Co., 517 F.3d 129, 135 (2d Cir. 2008) (quotation marks omitted). We construe the statute liberally and have interpreted each of these requirements broadly. Id. at 136. The term "person" includes corporations. Id. at 135. A person who assists, is supervised by, or receives delegated authority from a federal officer qualifies as one who is "acting under" the officer. Id. at 136–37. The causal connection implied by the "under color of . . . office" requirement is satisfied if the challenged act "occurred while [d]efendants were performing their official duties." Id. at 137–38 (emphasis in original). And "[c]ourts have imposed few limitations on what qualifies as a

colorable federal defense." Id. at 138; see id. at 139–40 (corporation claiming

government contractor defense raised colorable federal defense).

Here, Midwest satisfies all of the requirements of section 1442(a)(1). It

is a "person" that assisted U.S. Air Force officers; it is being sued for allegedly

negligent acts that occurred while performing its official air traffic control

duties; and its claim of federal preemption based on the FTCA's combatant

activities exception qualifies as a colorable federal defense. See Jefferson

Cnty. v. Acker, 527 U.S. 423, 431 (1999) (defendants need only raise a

"colorable defense," even if we reject that defense). The District Court

therefore properly exercised jurisdiction over the present action pursuant to

the federal officer removal statute.

II

The Plaintiffs-Appellants next argue that the District Court erred in

granting summary judgment in favor of Midwest on the ground that their

state-law claims were preempted by the combatant activities exception of the

FTCA.

A

The FTCA waives the federal Government's sovereign immunity from tort claims brought against the United States for harm caused by the negligence or wrongful conduct of "any employee of the Government." 28 U.S.C. § 1346(b)(1); see id. § 2674. The FTCA contains several exceptions, which preserve the Government's sovereign immunity under specified circumstances. See id. § 2680. Relevant here, the "discretionary function" exception bars claims "based upon the exercise or performance [of] . . . a discretionary function or duty on the part of a federal agency or an employee of the Government," id. § 2680(a), and the "combatant activities" exception contained in 28 U.S.C. § 2680(j) bars claims "arising out of the combatant activities of the military or naval forces . . . during time of war," id. § 2680(j). But the FTCA explicitly excludes "any contractor with the United States" from the definition of "[f]ederal agenc[ies]" covered by the statute and limits the "[e]mployee[s]" covered by the statute to, as relevant here, "officers or employees of any federal agency." Id. § 2671. The FTCA thus excludes military contractors from the scope of the Government's retained sovereign immunity.

Despite the plain language excluding government contractors, in <u>Boyle</u>

<u>v. United Technologies Corporation</u>, 487 U.S. 500 (1988), the Supreme Court

held that the FTCA's discretionary function exception preempted state-law

claims arising from a contractor's alleged design defect where "the state-

imposed duty of care . . . [was] precisely contrary to the duty imposed by the

Government." <u>Id.</u> at 509; <u>see id.</u> at 510–13. <u>Boyle</u> involved a Marine who

drowned when he was unable to escape his helicopter after it crashed into the

ocean during a training exercise. <u>Id.</u> at 502. The Marine's father brought

state-law tort claims against the contractor that built the helicopter, alleging

that the design of the helicopter's emergency escape system was defective. <u>Id.</u>

at 503. The escape hatch, per the Government's specifications, opened

outward instead of inward, rendering it ineffective in a submerged craft. <u>Id.</u>

at 503, 509.

On review, the Court first identified an "area of uniquely federal

interest" in "the procurement of equipment by the United States." <u>Id.</u> at 507;

<u>see also id.</u> at 505 n.1 ("[T]he liability of independent contractors performing

work for the Federal Government . . . is an area of uniquely federal interest.").

It next identified the potential for significant conflict between "state law

26

which holds Government contractors liable for design defects" and the discretionary function of selecting an appropriate design for equipment for the United States Armed Forces. Id. at 512. Finally, to determine the appropriate "scope of displacement" of state law, the Court adopted a three-part test: "Liability for design defects in military equipment cannot be imposed, pursuant to state law," it said, "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment." Id. These conditions "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." Id.

In short, "under Boyle, for the military contractor defense to apply, government officials ultimately must remain the agents of decision." In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 630 (2d Cir. 1990) ("Asbestos Litigation"). That is, state-law claims against military contractors are preempted under Boyle only where the federal Government has mandated the action that allegedly violated state law.

B

Midwest does not argue (nor could it) that it is covered under the FTCA or that the Plaintiffs-Appellants' claims are preempted as a result of the limited holding in <u>Boyle</u> itself. Instead, Midwest asks us to extend the application of the federal common-law defense in <u>Boyle</u> to the FTCA's combatant activities exception, which preserves the Government's immunity from claims arising out of "combatant activities of the military . . . during time of war." 28 U.S.C. § 2680(j). Midwest argues that, under the logic of <u>Boyle</u>, it is protected by the combatant activities exception because the claims against it arose from its involvement in combatant activities of the U.S. military.

Such an extension would protect military contractors from state-law claims premised on conduct not mandated, authorized, or even considered by the federal Government. In the absence of clear direction from Congress or the Supreme Court, we decline Midwest's invitation.

1

As an initial matter, we recognize that several of our sister Circuits have to varying degrees extended the application of <u>Boyle</u> to the FTCA's combatant activities exception. The process of extending <u>Boyle</u> beyond its specific facts

28

began with a case that, like Boyle, involved products liability claims against manufacturers of military equipment.

In Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992), the Ninth Circuit held that the combatant activities exception preempted tort claims against the manufacturer of an air defense system that U.S. naval personnel used to shoot down an Iranian commercial airliner. Id. at 1336–37. The court explained that the combatant activities exception "recognize[s] that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." Id. at 1337 (emphasis added). Because the authorized "direction of force against the aircraft by United States naval forces cannot give rise to tort liability [under the FTCA]," and "imposition of liability on [the] defense contractor 'w[ould] produce [the] same effect sought to be avoided by the FTCA exception,'" the Ninth Circuit held that state-law claims against the contractor for the military's use of force were preempted. Id. (quoting Boyle, 487 U.S. at 511).

In Saleh v. Titan Corp., 580 F.3d 1 (D.C. Cir. 2009), the D.C. Circuit extended Boyle beyond the products liability context, to lawsuits under D.C. tort law against private contractors who worked as interpreters and

29

interrogators at Abu Ghraib prison in Iraq and allegedly participated in the atrocities committed there. The majority opinion first addressed "whether a significant conflict exists between the federal interests and D.C. tort law" by considering the purpose of the combatant activities exception. Id. at 7. Describing the legislative history of the exception as "singularly barren," the majority rejected the Ninth Circuit's more limited view of the federal interests that the exception seeks to protect. Id. "The policy embodied by the combatant activities exception," the majority concluded, "is simply the elimination of tort from the battlefield." Id. Whereas state and federal law imposed specific and conflicting duties that justified preemption in Boyle, the majority in Saleh held that "it is the imposition per se of the state or foreign tort law that conflicts with the FTCA's policy of eliminating tort concepts from the battlefield." Id. The majority then fashioned a two-part test to determine the scope of displacement: "During wartime, where a private service contractor is [1] integrated into combatant activities over which [2] the military retains command authority, a tort claim arising out of the contractor's

engagement in such activities shall be preempted." Id. at 9.[6] Saleh thus represents a substantial expansion of the Boyle preemption doctrine.

By contrast, the dissent in Saleh thought that the "preemption question in these cases should be controlled by Boyle, which authorizes displacement of state law only when a federal contract imposes a directly conflicting duty on a contractor." Id. at 32 (Garland, J., dissenting). The dissent observed that unlike the Government-mandated helicopter design in Boyle, the alleged conduct of the contractors in Saleh violated federal law and policy. Id. at 23. And, "[u]nlike the situation in Koohi, where sailors fired the weapon, there [was] no claim . . . that the force used against the plaintiffs was either 'directed' or 'authorized' by U.S. military personnel." Id. at 24. Without "incompatible" state and federal duties, the dissent said, there was "no warrant for preemption." Id. at 23.

---

[6] The Saleh majority also rejected the analysis of the district court in that case, which identified a federal interest in "shield[ing] military combat decisions from state law regulation" and therefore held that preemption was justified only where contractors were "under the direct command and exclusive operational control of the military chain of command such that they are functionally serving as soldiers." Ibrahim v. Titan Corp., 556 F. Supp. 2d 1, 5 (D.D.C. 2007), rev'd in part, Saleh, 580 F.3d 1.

31

Since Saleh, two other circuits have applied Boyle to the combatant activities exception. In a case from the Third Circuit, Harris v. Kellogg Brown & Root Services, Inc., 724 F.3d 458 (3d Cir. 2013), the parents of a U.S. soldier who died by electrocution while showering at his barracks in Iraq filed negligence claims against the U.S. military contractor hired to perform maintenance at the barracks. Id. at 463. And in In re KBR, Inc., Burn Pit Litigation, 744 F.3d 326 (4th Cir. 2014), a Fourth Circuit case, U.S. military personnel who served in Iraq and Afghanistan brought various state-law tort claims for injuries suffered as a result of military contractors' waste disposal and water treatment practices, which allegedly violated military directives and the defendants' contract with the government. Id. at 331–32. In both of these opinions, the circuits rejected the Ninth Circuit's narrow view and the D.C. Circuit's broad view of the relevant federal interest, holding instead that the purpose of the combatant activities exception "is to foreclose state regulation of the military's battlefield conduct and decisions." Harris, 724 F.3d at 480; see In re KBR, 744 F.3d at 348.

Having paved a middle ground on the federal interest at issue, the Third and Fourth Circuits nevertheless retained Saleh's two-part "combatant-

32

activities, command-authority" test for determining the scope of preemption (that is, whether the contractor is (1) integrated into combatant activities over which (2) the military retained command authority). See Harris, 724 F.3d at 480–81; In re KBR, 744 F.3d at 349–51. The Third Circuit considered that test "well-tailored to the purpose underlying § 2680(j)." Harris, 724 F.3d at 481. "The first prong—whether the contractor is integrated into the military's combatant activities—ensures that preemption occurs only when battlefield decisions are at issue. And the second prong—whether the contractor's actions were the result of the military's retention of command authority—properly differentiates between the need to insulate the military's battlefield decisions from state regulation and the permissible regulation of harm resulting solely from contractors' actions." Id. Both prongs need to be satisfied for preemption to occur.

After applying the two-part test, the Third and Fourth Circuits in Harris and In re KBR concluded that the relevant state laws were not preempted. In Harris, for example, the Third Circuit held that the state-law claims brought by the parents of the soldier electrocuted in the shower were not preempted even though the contractor's maintenance of electrical systems

at a barracks in an active war zone was a combatant activity and therefore satisfied the first prong of the test. The Third Circuit determined that the contractor had failed to satisfy the second prong of the test because "[t]he military did not retain command authority over [the contractor's] installation and maintenance." Id. "[T]he relevant contracts and work orders," the court explained, "did not prescribe how [the contractor] was to perform the work required of it." Id. Rather, the contracts "provided for general requirements or objectives" and gave the contractor "considerable discretion in deciding how to satisfy them." Id.; see also In re KBR, 744 F.3d at 351 (vacating the district court's dismissal of the injured servicemembers' claims because "the extent to which [the contractor] was integrated into the military chain of command is unclear").

2

On appeal, Midwest urges a significant extension of Boyle and the federal common-law defense it recognized. But the Supreme Court has repeatedly "underscore[d] the care federal courts should exercise before taking up an invitation to try their hand at common lawmaking." Rodriguez v. FDIC, 140 S. Ct. 713, 718 (2020). And the Court "has never extended Boyle

34

beyond the discrete conflicts that application of the discretionary function exception targets." <u>Saleh</u>, 580 F.3d at 24 (Garland, <u>J.</u>, dissenting).

<u>Boyle</u> held that state law would not be preempted where the plaintiffs sought to impose a duty on a contractor that was neither "identical to one assumed under the contract" nor "contrary to any assumed." <u>Boyle</u>, 487 U.S. at 509. If a "contractor could comply with both its contractual obligations and the state-prescribed duty of care[,] [n]o one suggests that state law would generally be pre-empted." <u>Id.</u> For example, a federal contract for the purchase of air conditioners that "specif[ied] the cooling capacity but not the precise manner of construction" would not preempt a state law imposing a duty of care to include a certain safety feature. <u>Id.</u> In <u>Boyle</u>, preemption was justified because the duty the plaintiffs sought to impose was precisely contrary to that imposed by the contract. <u>Id.</u>[7] The Court thus characterized its holding in <u>Boyle</u> as a "special circumstance" in which the "government has

---

[7] <u>Boyle</u> similarly distinguished <u>Miree v. DeKalb County</u>, 433 U.S. 25 (1977), in which the Court held that federal common law did not preempt state-law claims arising from an aviation accident, on the ground that the plaintiffs in <u>Miree</u> were "not seeking to impose upon the person contracting with the Government a duty contrary to the duty imposed by the Government contract." <u>Boyle</u>, 487 U.S. at 508.

directed a contractor to do the very thing that is the subject of the

claim." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 74 n.6 (2001).[8]

Our Court has likewise declined to expand the government contractor

defense beyond Boyle's direct conflict rationale. We have instead limited

contractor liability only where the government mandated the action that

violated state law. See Asbestos Litig., 897 F.2d at 630 ("[G]overnment

officials ultimately must remain the agents of decision."); In re Agent Orange

Prod. Liab. Litig., 517 F.3d 76, 90 (2d Cir. 2008) ("If the government buys a

product 'off-the-shelf' . . . the seller of that product cannot be heard to assert

---

[8] The Supreme Court's guidance on the related doctrine of "derivative sovereign immunity" is one more reason to avoid expanding Boyle. The Court's decision in Boyle drew support from Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940), a leading derivative sovereign immunity case. See Boyle, 487 U.S. at 506. The Court recently explained that the "[c]ritical" factor in Yearsley was "the contractor's performance in compliance with all federal directions"; in other words, the contractor had a defense because its actions were "all authorized and directed by the Government of the United States." Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 167 & n.7 (2016) (quoting Yearsley, 309 U.S. at 20); see also Kate Sablosky Elengold & Jonathan D. Glater, The Sovereign Shield, 73 STAN. L. REV. 969, 987–92 (2021) (analyzing the relationship between Boyle and Yearsley and concluding that, under either doctrine, the key question is "did the government dictate the actions, or did the government leave them to the contractor's discretion?"); In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 197 (2d Cir. 2008) (requiring a showing that "federal agencies exercised supervision, control, and enforcement authority," rather than "merely accept[ing], without substantive review or enforcement authority, decisions made by [the contractor]").

that it is protected from the tort-law consequences of the product's defects . . .

[because] the seller was not following the government's discretionary

procurement decisions.").  In Asbestos Litigation, for example, the defendant-

contractor relied on Boyle to defend against a claim that it was liable under

state law, which the contractor said "would result in the imposition of pass-

through costs from the contractor upon the Government."  Asbestos Litig.,

897 F.2d at 631.  We rejected the contractor's reliance on Boyle.  "Had Boyle's

aim been to prevent military contractors from passing any liability costs on to

the Government," we said, "it simply could have granted military contractors

a blanket immunity from all state tort liability."  Id.  The contractor in

Asbestos Litigation also claimed that it was entitled to a defense under Boyle

because the Government would be immune under the discretionary function

exception for its "conscious decision not to warn those working in shipyards

. . . of the dangers" presented by asbestos.  Id.  In response, we pointed to the

"crucial distinction" between the defense recognized in Boyle and the

Government's immunity under the discretionary function exception.  Id.

at 632.  The relevant issue in assessing the contractor's liability, we said, is not

the scope of the Government's immunity under an FTCA exception.

37

"Stripped to its essentials, the military contractor's defense under <u>Boyle</u> is to claim, 'The Government made me do it.'" <u>Id.</u> We have thus consistently recognized that "<u>Boyle</u> hinges the military contractor defense upon the military contractor's having followed a government-approved requirement contrary to a state tort law duty." <u>Id.</u> at 631. And we have declined to extend <u>Boyle</u>'s atextual preemption defense beyond that core rationale.

Commentators generally agree that "courts should not create a combatant-activities defense for government contractors," Margaret Z. Johns, <u>Should Blackwater and Halliburton Pay for the People They've Killed? Or Are Government Contractors Entitled to a Common-Law, Combatant-Activities Defense?</u>, 80 TENN. L. REV. 347, 351 (2013), or at least that preemption is appropriate only "in cases where the contractor was under the supervision and control of the military" and "government conduct substantially circumscribe[d] contractor discretion," Andrew Finkelman, <u>Suing the Hired Guns: An Analysis of Two Federal Defenses to Tort Lawsuits Against Military Contractors</u>, 34 BROOK. J. INT'L L. 395, 461–63 (2009). <u>See</u> <u>also</u>, <u>e.g.</u>, Stephen I. Vladeck, <u>The Demise of Merits-Based Adjudication in Post-9/11 National Security Litigation</u>, 64 DRAKE L. REV. 1035, 1073 (2016); Rodney M. Perry,

Note, Fixing the Faults: An Argument Against the *Saleh v. Titan Corp.* Rule for Private Military Contractor Immunity, 42 PUB. CONT. L.J. 607, 623 (2013) (noting that under Saleh military contractors may be afforded broader protection from tort liability than U.S. servicemembers enjoy under the Westfall Act).  Even those who favor broad protection for military contractors question the legal basis for judicial expansion of Boyle beyond the "special circumstances" of that case.  See, e.g., Major Jeffrey B. Garber, The (Too) Long Arm of Tort Law: Expanding the Federal Tort Claims Act's Combatant Activities Immunity Exception to Fit the New Reality of Contractors on the Battlefield, ARMY LAW., Sept. 2016, at 20 (conceding that it is "undeniable that a straight-forward reading of the [FTCA] weighs against the application of the [combatant activities] exception to contractors" and therefore advocating for congressional expansion of contractor liability protections to address the "unsustainable status quo"); see also Brief of Retired Military Officers as Amici Curiae at 7–28, Al Shimari v. CACI Int'l, Inc., 679 F.3d 205 (4th Cir. 2012) (Nos. 09-1335, 10-1891, 10-1921) (arguing that the D.C. Circuit's decision in Saleh runs counter to the law of war's fundamental distinction between

combatants and civilians, as well as U.S. military regulations and public policy).[9]

The text of the FTCA, <u>Boyle</u> itself, precedent from this Circuit, and various commentators suggest that only Congress can do what Midwest asks us to do. "The enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary . . . but by the people through their elected representatives in Congress." <u>City of Milwaukee v. Illinois</u>, 451 U.S. 304, 312–13 (1981); <u>see</u> <u>Wyeth v. Levine</u>, 555 U.S. 555, 565 (2009) ("[W]e start with the assumption that [state law is] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." (quotation marks omitted)). Even if "[i]t may well be that, all things being equal, state law

---

[9] These widespread concerns are amplified by the lack of a limiting principle on the preemption recognized in <u>Saleh</u>. The military contractor defense recognized in <u>Boyle</u> may have been "atextual," but it was limited by the requirement of a "discrete conflict." <u>Saleh</u>, 580 F.3d at 23 (Garland, <u>J.</u>, dissenting). By contrast, the broad preemption based on the combatant activities exception that Midwest seeks has few apparent bounds. The FTCA also contains exceptions for "[a]ny claim arising in a foreign country," 28 U.S.C. § 2680(k), and "[a]ny claim arising out of assault[] [or] battery," 28 U.S.C. § 2680(h). Would these exceptions preempt all tort claims against military contractors operating abroad? "Once we depart from the limiting principle of <u>Boyle</u>, it is hard to tell where to draw the line." <u>Saleh</u>, 580 F.3d at 23 (Garland, <u>J.</u>, dissenting).

ought to play very little role in creating liability for the actions of private military contractors overseas," it is entirely unclear that "the federal courts ([as opposed to] the political branches) have the ability to say so." Vladeck, The Demise of Merits-Based Adjudication in Post-9/11 National Security Litigation, supra, at 1073; cf. Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1403 (2018) ("The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns."). We therefore decline to expand Boyle beyond its direct conflict rationale.

3

Keeping that rationale in mind, we have no problem retaining Boyle's useful "analytic process" for determining whether federal law preempts state-law claims against government contractors. Harris, 724 F.3d at 479; see In re KBR, 744 F.3d at 347 (similar). Under that process, we consider whether a "significant conflict" exists between a "uniquely federal interest" (reflected in the combatant activities exception) and the operation of state law, and then determine the appropriate scope of displacement resulting from the conflict. Boyle, 487 U.S. at 507–12.

We begin with the relevant federal interest. As noted, four sister Circuits have reached varying conclusions about the "uniquely federal interest" implicated by state-law tort claims arising out of a government contractor's involvement in combatant activities. The Ninth Circuit held that the combatant activities exception "recognize[s] that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." Koohi, 976 F.2d at 1337. The D.C. Circuit broadly held that "the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield." Saleh, 580 F.3d at 7. And the Third and Fourth Circuits came out somewhere in the middle, holding that the purpose of the combatant activities exception "is to foreclose state regulation of the military's battlefield conduct and decisions." Harris, 724 F.3d at 480; see In re KBR, 744 F.3d at 348.

There is, we admit, "very little authority for us to rely on to resolve this disagreement," Harris, 724 F.3d at 479, but resolve it we must. Our principal concern with the Ninth Circuit's narrow focus on "those against whom force is directed" is that it ignores that the combatant activities exception "would prevent suits against the military for harm it causes through friendly fire." Id.

42

at 480. On the other hand, the D.C. Circuit's blanket statement "loses sight of the fact" that the FTCA "does not provide immunity to nongovernmental actors"; thus, "to say that Congress intended to eliminate all tort law is too much." Id. Ultimately, we find the analysis of the Third and Fourth Circuits more persuasive and "adopt [their] formulation of the interest at play here." In re KBR, 744 F.3d at 348.

So what is the proper scope of displacement resulting from the conflict between the federal interest in foreclosing state regulation of the military's battlefield decisionmaking and the operation of state tort law? As noted, the Third and Fourth Circuits adopted Saleh's two-part test for determining the scope of preempted state claims (again, that test is whether the contractor was (1) "integrated into combatant activities," (2) "over which the military retain[ed] command authority"). Saleh, 580 F.3d at 9; see Harris, 724 F.3d at 480–81; In re KBR, 744 F.3d at 349–51. But recall that the D.C. Circuit designed its test around the FTCA's purported "policy of eliminating tort concepts from the battlefield," Saleh, 580 F.3d at 7, a broad interest indeed. So the Third and Fourth Circuits' more narrowly defined federal interest in foreclosing state regulation of the military's battlefield conduct and decisions

43

will result in a correspondingly more modest displacement of state law.[10] No

significant conflict exists between that interest and state law unless the

challenged action can reasonably be considered the military's own conduct or

decision and the operation of state law would conflict with that decision.

With that in mind, we conclude that the combatant activities exception

does not displace state-law claims against contractors unless (1) the claim

arises out of the contractor's involvement in the military's combatant

activities, and (2) the military specifically authorized or directed the action

giving rise to the claim. These two conditions "assure that the suit is within

the area where the policy of the [combatant activities exception] would be

frustrated—i.e., they assure that the [contractor's action giving rise to the

---

[10] The federal Government itself criticized the Saleh test as "inexact, unclear, and potentially misguided." Brief for United States as Amicus Curiae at 15, Saleh v. Titan Corp., 564 U.S. 1037 (No. 09-1313). In particular, the Government has argued, the two-part Saleh test "misunderst[ands] the circumscribed role private contractors play in war zones" under both the law of war and U.S. military regulations; it improperly focuses on "whether the tortfeasor is himself engaging in a combatant activity," rather than on the military's combatant activities; and it "d[oes] not address whether application of the preemption defense it recognized would be appropriate if the contractor employees acted outside the scope of their employment or the contractor acted outside the scope of the contract," and thus might afford more protection to private contractors than U.S. military personnel receive under the Westfall Act. Id. at 15–17. In any event, the narrower federal interest identified by the Third and Fourth Circuits plainly calls for a narrower displacement.

claim] was considered by a Government officer, and not merely by the contractor itself." Boyle, 487 U.S. at 512; see also Ibrahim v. Titan Corp., 556 F. Supp. 2d 1, 5 (D.D.C. 2007) ("[C]ommon law claims against private contractors will be preempted [by the combatant activities exception] only to the extent necessary to insulate military decisions from state law regulation." (emphasis in original)). The combatant activities exception would thus "displace[] state law only when the Government, making a . . . [battlefield] decision contrary to the requirements of state law, incorporates this decision into a military contractor's . . . obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." Asbestos Litig., 897 F.2d at 632. This test captures both the federal interest embodied in the combatant activities exception and the requirements of Boyle itself. In addition, it preempts only those claims that would, if successful, impose state-law duties in conflict with the military's battlefield decisionmaking.[11]

---

[11] Under this rule, the fact that "the military retain[ed] command authority," Saleh, 580 F.3d at 9, might create a question of fact as to whether the military authorized a particular action, but it would not be dispositive. See Boyle, 487 U.S. at 514 (noting that "whether the facts establish the conditions for the defense is a question for the jury").

The test also strikes the proper balance between protecting military decisionmaking and opening the federal courthouse doors to a plaintiff's legitimate state-law claims. Consider Koohi, for example. There, the plaintiffs' claims against the manufacturer of a U.S. Navy air defense system would be preempted under our test because the claims arose out of the contractor's supply of a military vessel's weapons, and the U.S. military itself fired the contractor's missile in an "authorized military action." Koohi, 976 F.2d at 1337. By contrast, under our test, the plaintiffs' claims in Saleh, Harris, and In re KBR would not be preempted on summary judgment because the challenged contractor actions in those cases were neither authorized nor directed by the military.[12]

C

The central act giving rise to the Plaintiffs-Appellants' state-law claims in this case was Midwest air traffic controller Smith's decision to cancel Flight 662's clearance to land, divert Flight 662 out of controlled Class D air space,

---

[12] Boyle requires that we engage in this analysis. More practically, in a small segment of cases—such as in Koohi, where the challenged action was the military's intentional firing of a missile—the Government becomes the agent of decision, even where it did not supply reasonably precise specifications to the contractor ex ante. The logic of Boyle applies to these cases.

and to inform the pilot that he would "call [his] base" (i.e., tell him when to turn) without having obtained a visual on the flight's proximity to the surrounding terrain. The record on summary judgment does not establish as a matter of law in Midwest's favor that the military authorized or directed Smith's action. It was therefore error for the District Court to hold that the Plaintiffs-Appellants' state-law claims were preempted.

In concluding that the U.S. military did not authorize or direct Smith's decision, we address two important facts.

First, Midwest's prime contract provided that "[a]ll work performed by the Contractor in support of this [Statement of Work] shall be in accordance with applicable . . . [ICAO] standards." The ICAO, in turn, provides that, for flights conducted in accordance with visual flight rules, "[t]he objectives of the air traffic control service . . . do not include prevention of collision with terrain." The Government thus required Midwest to comply with the ICAO, which did not itself require controllers to prevent collisions with terrain. Second, the U.S. Air Force officer at KAIA's control tower emphasized in an email to the chief executive of Midwest that "ALL operational issues WILL BE DIRECTED to/through [the officer] or [his deputy] first." While defending

47

the need for Midwest controllers to advise their corporate supervisors about all issues at the KAIA tower, Midwest's chief executive acknowledged that the captain was "in charge at the tower."

There was evidence that the military retained some authority at KAIA's tower and, at a very general level, approved ICAO standards. But we see no evidence that the Government directed Smith's actions at issue here. The Government did not issue a specific instruction that compelled Smith's directions to Flight 662 (allegedly in violation of his state-law duty of care). Cf. Boyle, 487 U.S. at 509 (no preemption where "the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed"). Indeed, no member of the U.S. military was even present in the tower the evening of the fatal crash. Preemption arises when the Government specifically authorizes or directs the contractor action, not when the Government generally permits the contractor to undertake a range of actions.

Midwest alternatively argues that Smith's air traffic control directions "at least partially implicate[] the military's decision to not equip the KAIA air traffic control tower with resources to provide [terrain separation services]."

Appellee's Br. 16. By that logic, any tort claim against a military contractor would involve an indirect challenge to the military's decision not to prevent the action that gave rise to the claim. We have rejected that same reasoning in failure-to-warn cases, in which we held that contractors cannot escape liability simply because the Government failed to require them to warn consumers or workers about dangerous conditions of which the Government was aware when contracting for the product. See Asbestos Litig., 897 F.2d at 631–32. We similarly conclude that the military's decision to stock the KAIA tower with certain equipment did not alone permit tower controllers to divert flights out of Class D air space without any warning or awareness of the flight's proximity to the surrounding terrain.

Again, the preemption principles underlying Boyle as applied to either the combatant activities exception (here) or the discretionary function exception (in Boyle) direct us to ask one basic question: whether "[t]he Government made [the contractor] do it." Asbestos Litig., 897 F.2d at 632.

Because the answer in this case is no, we conclude that the District Court erred in granting summary judgment to Midwest on preemption grounds.[13]

### III

Finally, the Plaintiffs-Appellants argue that the District Court erred in granting summary judgment to Midwest on the grounds that, as a matter of law, the Defendant-Appellee neither owed a duty of reasonable care to Flight 662 nor proximately caused the October 12, 2010 crash. We conclude that summary judgment should not have been granted on either ground. The Defendant-Appellee, acting through the local air traffic controller, Smith, owed a duty of care to Flight 662, and the Plaintiffs-Appellants have produced sufficient evidence for a jury to conclude that this duty was breached and that such breach proximately caused the fatal crash.

---

[13] The outcome would be the same under Boyle itself. We assume without deciding that Boyle applies to contracts for services as well as for goods. See Hudgens v. Bell Helicopters, 328 F.3d 1329, 1334, 1345 (11th Cir. 2003) (discretionary function exception preempted claims based on defendant-contractor's allegedly negligent service and maintenance of helicopters). Preemption based on a contract for services would still demand that "government officials ultimately must remain the agents of decision." Asbestos Litig., 897 F.2d at 630; accord Hudgens, 328 F.3d at 1335–37 (requiring the contractor to establish that (1) the U.S. approved reasonably precise procedures; (2) the contractor's performance conformed to those procedures; and (3) the contractor warned the U.S. about the dangers associated with those procedures that were known to the contractor but not to the U.S.). Midwest does not argue that Smith's instructions to Flight 662 meet this standard.

The parties and the District Court proceeded as if New York law applies, although they cited "cases from a variety of jurisdictions but not including [the law of Afghanistan]." Stanford v. Kuwait Airways Corp., 89 F.3d 117, 122 (2d Cir. 1996). Under such circumstances, it is indeed generally appropriate to apply New York law and familiar concepts of common-law tort liability to determine the rights of the parties. Id.; Johnson v. Priceline.com, Inc., 711 F.3d 271, 275–76 & n.2 (2d Cir. 2013). Accordingly, the Plaintiffs-Appellants' negligence claims require them to establish that (1) Midwest owed them a duty of care, (2) Midwest breached this duty, and (3) the Plaintiffs-Appellants suffered damages as a proximate result of that breach. Di Benedetto v. Pan Am World Serv., Inc., 359 F.3d 627, 630 (2d Cir. 2004) (citing Solomon by Solomon v. City of New York, 66 N.Y.2d 1026, 1027 (1985)).

Beginning with the duty of care, a legal question, id., neither New York state courts nor this Court has yet addressed the scope of an air traffic controller's duty of care to a pilot operating under VFR. Out-of-circuit cases, however, have adopted some basic principles that the parties do not meaningfully dispute: Air traffic controllers and pilots generally share a

51

concurrent duty to ensure an aircraft's safe operation.  See Beech Aircraft

Corp. v. United States, 51 F.3d 834, 838 (9th Cir. 1995) (per curiam).  "Both the

pilot and the air traffic controller owe a duty of care to passengers in an

airplane. . . .  Each is responsible for the safe conduct of the aircraft and the

safety of its passengers."  Redhead v. United States, 686 F.2d 178, 182 (3d Cir.

1982).  While "[t]he pilot is in command of the aircraft, is directly responsible

for its operation, and has final authority as to its operation," id., "[t]ower

personnel and air traffic controllers are often a source of vital information,"

the negligent provision of which may lead to crashes, id.

    With respect to VFR flights, however, courts have held that pilots are

responsible for their own terrain separation and have, accordingly,

recognized a more circumscribed duty for air traffic controllers.  As one court

has summarized such non-Second Circuit precedent:  "The case law is

incontrovertible that an aircraft operating pursuant to visual flight rules must

provide its own navigation and clearance from obstructions.  The duty to

operate the aircraft, and to navigate, is assigned to the pilot who must provide

his own separation from obstructions, and other aircraft, while in VFR

conditions."  In re Air Crash Near Rio Grande, Puerto Rico, on Dec. 3, 2008,

No. 11-CV-80761, 2016 WL 6916600, at *5, 2016 U.S. Dist. LEXIS 148178, *18

(S.D. Fla. Oct. 24, 2016) (quoting Baker v. United States, 417 F. Supp. 471, 484

(W.D. Wash. 1975)).

But however limited in scope, the controller also has responsibilities

with respect to a VFR flight.  As one district court observed, air traffic

controllers have been held to have such a duty to issue safety warnings

"beyond those required by [applicable controlling documents and] manuals":

> (1) when danger to the aircraft is immediate and extreme;
> (2) when the air traffic controller is able to gather more
> information or make more accurate observations than the
> pilot; (3) when the controller is better qualified than the
> pilot to evaluate the danger; (4) when the pilot declares an
> emergency or indicates distress; (5) when danger is
> "reasonably apparent" to the controller but not apparent,
> in the exercise of due care, to the pilot; and (6) when the
> controller has conveyed dangerously inaccurate or
> misleading information to the pilot.

Turner v. United States, 736 F. Supp. 2d 980, 1008 (M.D.N.C. 2010) (citations

omitted).[14]

---

[14] Courts, including this Circuit, have also recognized that a controller's failure to report significant weather conditions may be negligent.  Ingham v. E. Air Lines, Inc., 373 F.2d 227, 240–41 (2d Cir. 1967); see also Himmler v. United States, 474 F. Supp. 914, 930 (E.D. Pa. 1979) ("A controller has a duty to report weather changes which, under the circumstances, a pilot would consider important in deciding whether to try to land and in preparing for the conditions he would meet in landing.").

To limn the bounds of a controller's duty to a VFR flight, we refer to two cases from our sister Circuits. First, in Wojciechowicz v. United States, 582 F.3d 57 (1st Cir. 2009), the First Circuit reviewed a case in which a small plane, flown under VFR, crashed into the El Yunque mountain in Puerto Rico, killing all aboard. Id. at 61. About five minutes before the crash, the pilot had spoken with an air traffic controller, who had given the pilot a go ahead for landing and provided an "approach vector to the airport." Id. at 62. The controller did not, however, direct the pilot to fly any particular route or at a specific altitude before entering that traffic pattern around the airport. Wojciechowicz v. United States, 576 F. Supp. 2d 241, 248–49 (D.P.R. 2008) ("[The pilot] was free to choose his own desired routing to the traffic pattern entry point . . . , as well as any altitude at any given point."), aff'd, 582 F.3d 57 (1st Cir. 2009). Before entering the pattern directed by the controller, the plane flew into clouds covering the terrain and crashed into El Yunque. Wojciechowicz, 582 F.3d at 63. The plaintiffs-appellants, who included the relatives of the pilot and passengers killed in the crash, faulted the controller for not directing the pilot away from the mountain or issuing a safety alert. Id. at 63–64. But the First Circuit, in affirming the district court's judgment in

54

favor of the controller following a bench trial, held that the controller had not violated a duty to separate the plane from the mountain because "[t]here [was] no serious contention that the pilot did not know where El Yunque was" and the controller "did not then know the plane's course or altitude or whether it was approaching or turning away from the obstruction." Id. at 61, 69. The controller likewise had no duty to issue a safety alert regarding unsafe proximity to the terrain; the controller had insufficient notice that the pilot "had placed himself in a dangerous position" because the pilot was operating under VFR and had made no distress calls. Id. at 70.

Second, in Yates v. United States, 497 F.2d 878 (10th Cir. 1974), the pilot of a small Cessna plane was flying under VFR into an Albuquerque, New Mexico airport. He contacted air traffic control for landing instructions. Id. at 880. The controller directed the pilot to follow closely behind a much larger TWA-operated Boeing 707 that would land just before his flight. Id. About three hundred feet from the near end of the runway, the Cessna pilot was hit by the 707's wake turbulence—which is "invisible and moves in a circular fashion from a vortex" and "is generated behind and below heavier aircraft"—and crashed. Id. at 880–81. The government—named a defendant

55

because the FAA operated the tower—argued that it could not be held liable for the crash because "the regulations establish that each pilot is in command of and responsible for his own aircraft and has the final authority with respect to its operation, and that it is up to the pilot to exercise his own judgment as to existence of hazard and to refuse to accept instructions which he considers increase his peril." Id. at 881. The Tenth Circuit rejected the argument, reasoning that a "controller's directions and warnings" are not "merely advisory." Id. at 883. "This becomes clear," the court continued, "in light of considering that if the pilot could depart from the control of the tower at any time[,] the control of the airfield traffic would soon become a shambles." Id. Further, the court concluded that the controller had an obligation to warn the Cessna pilot of potential wake turbulence because "[i]n relationship to the extent of the hazard[,] the warning would have called for very little effort." Id.

Of the many important differences between Wojciechowicz and Yates, one is critical here: While the plane in the former case crashed before it had entered the traffic pattern provided by the air traffic controller, the plane in the latter case crashed from the 707's wake turbulence, which the controller

56

should have known about, while complying with the controller's instruction to land behind the larger plane. At the very least, then, these cases taken together, although not binding on us, stand for the proposition that a controller has a duty not to lead a VFR flight into a danger that the controller is or should be aware of. This is consistent, too, with the above-quoted statement from Turner, that courts have held a controller to a duty to warn a VFR flight when he "has conveyed dangerously inaccurate or misleading information to the pilot," "is able to gather more information or make more accurate observations than the pilot," or "is better qualified than the pilot to evaluate the danger." Turner, 736 F. Supp. 2d at 1008.

Accordingly, we cannot agree with the District Court or the Defendant-Appellee that the common law imposes on a controller like Smith no duty of care to a VFR flight. The common-law principle that an aircraft operating pursuant to VFR must provide its own terrain separation and obstacle avoidance does not free from any potential liability an air traffic controller who guides the plane into danger that the controller knew about or ought to have known about.

Stated in general terms, we think that Midwest was obligated not to put Flight 662 in peril that a reasonable controller would—or at least should—have foreseen or anticipated. But while "the scope of the legal duty of a controller to issue a warning is easily defined in general terms," such duty in a given case "is very fact specific and will probably require a different action in every circumstance." Id. (quoting In re Greenwood Air Crash, 873 F. Supp. 1257, 1265 (S.D. Ind. 1995)). We agree with these other courts that have recognized that "[i]n virtually every case what a reasonable [controller] would do in the defendant's position will necessarily need to be established through expert testimony." Id. (quoting Greenwood Air Crash, 873 F. Supp. at 1266). Yet the District Court disregarded the Plaintiffs-Appellants' experts' views on the controller's duty of care in this case. According to the District Court, expert witness Julie Harvey's opinion that Smith assumed a duty when he redirected Flight 662 was undermined by her acknowledgement that under VFR, pilot Bulos was responsible for terrain separation. The District Court also disregarded the opinion of the Plaintiffs-Appellants' other expert, Colin Sommer, because it thought that Sommer's view that Smith's conduct gave rise to a duty to separate the aircraft from the terrain lacked common-law

58

support. But as explained above, the common law does not eliminate a controller's duty of reasonable care when guiding a VFR flight. Indeed, it is the proper role of these experts to opine on what a reasonable controller would have done in the Kabul tower that fateful evening.

We also find unconvincing Midwest's argument that it owed no duty to Flight 662 because the controlling documents in place at KAIA provided that pilots held the ultimate responsibility for aircraft safety, including obstacle avoidance. Appellee's Br. 37. As we have noted, the Afghanistan AIP stated that the "[u]ltimate responsibility for aircraft and terrain avoidance rests with the pilot in command." App'x 1458. And under the ICAO standards, "[t]he objectives of the air traffic control service [for VFR flights] . . . do not include prevention of collision with terrain." App'x 1688. While these rules might be relevant to the division of responsibilities between a controller and a pilot operating under VFR, or in determining whether any duty of care was breached, we cannot agree that they foreclose the imposition of any liability where the controller leads a pilot into danger. Holding otherwise would render a controller's instructions as "merely advisory." Yates, 497 F.2d at 883 ("We cannot, therefore, accept the view that the controllers with the complex

59

equipment which they employ are there merely to give advice."); see

Himmler, 474 F. Supp. at 928 ("Where, as here, a pilot places himself in the

hands of the controller and thereafter follows the controller's suggestions or

instructions, the pilot is entitled to rely upon such information and directions

and is not free or expected to disregard same."). Under Midwest's view, a

pilot in Bulos's position might be required to ignore a controller's direction to

preserve the safety of the aircraft, possibly putting others—including nearby

traffic like Ariana 2748—in harm's way, thus creating the very disorder that

air traffic control exists to prevent. App'x 1364 ("The ATC Local Controller is

responsible for providing safe, orderly and expeditious control to all aircraft

operating in the Kabul [Control Zone]."); see also Yates, 497 F.2d at 883 ("[I]f

the pilot could depart from the control of the tower at any time[,] the control

of the airfield traffic would soon become a shambles.").

Underscoring this conclusion that the controlling evidence and

testimony do not extinguish Midwest's duty of care to Flight 662, moreover, is

Harvey's report and testimony. She opined that Smith's instructions to Bulos

to "extend your downwind" and "I'll call your base" would have been

understood by the pilot to be mandatory and not advisory.  See, e.g.,

App'x 1020–24, 1085, 1141–42.

The control tower's lack of equipment capable of indicating an

airplane's proximity to the terrain also does not nullify the controller's duty to

exercise reasonable care.  What Smith knew, or should have known, when

communicating with Flight 662 that evening relates not to the existence of his

duty to exercise reasonable care but to whether such duty was breached—an

issue best left to the trier of fact.  See, e.g., Williams v. Utica Coll. of Syracuse

Univ., 453 F.3d 112, 118–19 (2d Cir. 2006).  While the limited equipment in the

tower could support a finding that Smith was unable to foresee the peril

awaiting Flight 662, we think that a reasonable jury could also conclude that

Smith's ignorance of the aircraft's position and unfamiliarity with the

surrounding terrain shows that he failed to exercise reasonable care in

guiding Bulos outside of Class D airspace.

Indeed, sufficient other evidence has been introduced to enable a

factfinder to conclude that Midwest breached its duty of reasonable care.

Smith asked Captain Bulos to continue flying east and told the pilot "I'll call

your base"—i.e., I will tell you when to turn toward the beginning of your

landing. Shortly thereafter, Flight 662 flew directly into a mountain east of the airport, outside of the Class D airspace that was the tower's zone of control, and into terrain with which Smith was unfamiliar. This all occurred in the evening, when the mountains surrounding Kabul are "jet black." From these facts alone a jury could find that Smith breached his duty of care.

To be sure, there is also evidence and testimony that cut the other way. For instance, Smith did not know about the problems with the plane's avionics equipment. He told Flight 662 to extend its downwind leg only after first asking if Bulos would be able to do so. And Bulos never indicated that he was having any difficulty carrying out his duties under VFR.

Smith also did not give Flight 662 a specific vector—Bulos appears responsible for what turned out to be the flight's final 116-degree heading. Smith also testified that, contrary to the Plaintiffs-Appellants' expert testimony, "I'll call your base" did not mean that the plane could not turn until he told it do so. We think that sorting through these facts to determine if Midwest failed to exercise reasonable care must, though, be left to a trier of fact.

The analysis is much the same with respect to proximate cause, which is ordinarily a question of fact for a jury. See, e.g., Benitez v. N.Y.C. Bd. of Educ., 73 N.Y.2d 650, 659 (1989) ("[I]ssues of proximate cause are generally fact matters to be resolved by a jury."). Flight 662 changed course to fly eastward in the direction of the mountain after Smith asked Bulos to extend its downwind leg. And the aircraft crashed just seconds after Smith told Bulos to continue on the flight's downwind leg and that he would "call [Flight 662's] base." We do not think that, in light of this evidence, the District Court could conclude as a matter of law that Midwest's conduct did not proximately cause the fatal crash.

Midwest asserts that Bulos must have been the sole proximate cause of the crash because he was flying under VFR and thus had exclusive responsibility for avoiding the terrain. But as we explained with respect to the duty of care, we decline to sanction a view of the law that exempts an air traffic controller from possible liability where its unreasonable instruction leads a flight—even one operating under VFR—into danger foreseeable to the controller.

Midwest similarly urges that Bulos's negligence severed any connection between Smith's conduct and the crash.  Id.  But as the New York Court of Appeals has explained:  "When a question of proximate cause involves an intervening act, 'liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence.'"  Hain v. Jamison, 28 N.Y.3d 524, 529 (2016) (emphasis omitted) (quoting Mazella v. Beals, 27 N.Y.3d 694, 706 (2016)).  Such a determination is normally a question for a factfinder, unless "only one conclusion may be drawn from the established facts."  Id. (quoting Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315 (1980)).  That is not the case here.  Midwest may be correct that the crash was not a foreseeable result of Smith's instructions because Bulos affirmed that he could extend his downwind leg and did not indicate that he was having difficulty avoiding the terrain.  But we think that a reasonable jury could also find to the contrary that Smith should have foreseen that guiding the plane, at night, toward "jet black" terrain that he was unfamiliar with (and that lay outside Class D airspace) would result in danger to Flight 662.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit.  For the foregoing reasons, we **VACATE** the judgment of the District Court and **REMAND** for further proceedings consistent with this opinion.